**YOUNGDALE & SONS
CONSTRUCTION CO.,
INC., etc., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 553–88C.

United States Court of Federal Claims.

Jan. 15, 1993.

See also 22 Cl.Ct. 345.

Larry E. Robinson, Los Angeles, CA, attorney of record, for plaintiff.

Steven L. Schooner, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This is a Contract Disputes Act (CDA) case in which the plaintiff, Youngdale & Sons Construction Co., Inc. (Youngdale),[1] seeks to recover damages in excess of $1.6 million, plus interest, from the defendant, the United States, acting through the Department of the Army, Corps of Engineers (Corps). In its complaint, plaintiff avers, *inter alia*, that during construction of the subject project, Visiting Officers' Quarters at Vandenberg Air Force Base, it encountered two differing site conditions, *i.e.*, excess ground water and subterranean rock formations. Plaintiff further avers that pursuant to the differing site conditions clause of subject contract, and given apposite case law, it is entitled not only to recover the additional costs incurred due to said conditions, but it is also entitled to

---

1. Formerly known as J.R. Youngdale Construc- tion Company, Inc.

utilize the total-cost method in proving derivative damages.[2]

The defendant, on the other hand, belatedly concedes to the pre-award existence of the excess ground water condition, but emphatically denies the existence of different site conditions regarding the rock. In addition to the foregoing, the defendant strongly contends that the plaintiff is not entitled to utilize the total-cost method in proving its damages; but rather, it is only entitled on this record to utilize the direct or specific cost method. For the reasons hereinafter expressed, the court finds, after a full and thorough review of the record, that the plaintiff is entitled to recover certain additional costs plus interest stemming from the excess water differing site condition only. With respect to the alleged rock differing site condition, we find that plaintiff is not entitled to any recovery thereunder, because it failed to prove by the requisite quantum that said condition constitutes a differing site condition. Moreover, we find that any damages to which plaintiff is entitled in view of the excess water differing site condition must be calculated pursuant to the direct cost method, and not the total-cost method, inasmuch as the plaintiff has failed to establish the necessary elements required under that method of calculating damages. Lastly, given that the plaintiff is entitled to recover damages

with respect to the excess water differing site condition, we accordingly find that the defendant is *not* entitled to liquidated damages under the terms of the contract.

Jurisdiction is premised on 41 U.S.C. § 609(a)[3] of the CDA.

### FACTS

On December 27, 1982, the defendant issued its invitation for bids (No. DACA–05–83–B–0040) on contract No. DACA–09–83–C–0053, for the construction of two two-story apartments and one two-unit single story apartment at Vandenberg Air Force Base. The estimated cost of the project noted by defendant was approximately $3,030,000 to complete. *Id.* Plaintiff and 11 other bidders[4] submitted their bids on January 26, 1983, for the Vandenberg project. Youngdale's bid of $2,693,800 was found to be considerably lower than that of the government's estimate, as well as that of the 11 other bidders; therefore, the government awarded the contract to Youngdale on or about February 24, 1983 (PX 5).

In furtherance of the award, on March 15, 1983, Youngdale received a Notice to Proceed dated March 8, 1983, from the government. The contract required that Youngdale complete the project by June 7, 1984, *i.e.*, within 450 calendar days. How-

---

**2.** At trial, plaintiff's proof with respect to damages focused *primarily*, if not exclusively, upon the utilization of the total-cost method as its only means of calculating its entitlement. In its post-trial submissions, however, plaintiff wisely decided not to put all its eggs in one basket. Instead, plaintiff emphasized that, although it is primarily entitled to relief under the total-cost method, in the event that the court determines that it has not carried its burden with respect to the requirements of said method, the court should consider various other recommended alternative methods of recovery to determine its damages, *i.e.*, modified total cost, productivity comparison, estimated evaluation, jury verdict, and cost plus.

**3.** Title 41, of the United States Code, § 609(a) states in pertinent part:

... in lieu of appealing the decision of the contracting officer under section 6 [41 U.S.C. § 605] to an agency board, a contractor may bring an action directly on the claim in the United States Claims Court [now the United States Court of Federal Claims], notwithstand-

ing any contract provision, regulation, or rule of law to the contrary.

**4.** The following 12 bids were submitted for the Vandenberg Visiting Officers' Quarters project:
1. J.R. Youngdale Construction Company, Inc.—$2,693,800.
2. Cox Construction & James M. Cox—$2,815,148.
3. Claude E. Atkins Enterprises, Inc.—$2,849,000.
4. Palmo Construction Co., Inc.—$2,967,000.
5. J.R. Roberts Corp./Kirkham Constructors, AJV—$3,093,000.
6. Harold J. Younger, Inc.—$3,094,000.
7. H.A. Ekelin & Associates—$3,233,000.
8. S.L.S. Construction Co., DBA Pacific Const. Co.—$3,333,333.
9. Brinegar & Fuller, Inc.—$3,370,490.
10. Charles Cunningham Construction Corp.—$3,373,000.
11. John R. Selby, Inc.—$3,666,000.
12. Ground Construction Co., Inc.—$3,996,987.
PX 7.

ever, this date was later revised by the government to June 13, 1984. In any event, on March 17, 1983, upon inspection[5] of the site, Youngdale personnel encountered 8 to 18 inches of ground water within 2 to 3 minutes of digging several potholes throughout the site. In addition, the soil removed from these holes was of a pancake-batter consistency. Upon discovering this condition, Youngdale immediately informed the government personnel at a preconstruction meeting of the saturated soil condition. The government indicated, in response, that all jobs on the base were experiencing similar problems. Notwithstanding, Youngdale sent Serial Letter No. 7 to the government on March 23, 1983, memorializing and advising it that Youngdale considered the saturated soil conditions to be materially different from those indicated in the contract documents and, therefore, it would reserve all rights with respect to any adjustments in time and price relating to what it deemed to be a compensable differing site condition. The government responded on April 5, 1983, with Serial Letter 005 denying that the conditions encountered were "inconsistent with those shown on the contract drawings and specifications." Moreover, on April 11, 1983, the government stated in another letter that "the saturated soil condition is normal at this time of year and therefore should have reasonably been anticipated [by the contractor]; hence, no pecuniary or time adjustments are deemed necessary."

However, despite the defendant's firm position, *supra*, Garcia Paving, one of Youngdale's subcontractors, was unable to clear and grub the site at the outset of the project because its equipment immediately became mired in the muddy soil and had to be removed from the site. In view thereof, Youngdale sent another letter on April 15, 1983, informing the government that it was unable to commence earthwork activities and that it needed clear direction as to how it should best proceed given the existing differing site condition. In addition, Youngdale forwarded to the government a report from Sobhani Engineers, a private engineering firm hired by Youngdale, to examine the soil conditions at subject site. The government, in turn, strongly responded on April 27, 1983, that the contract correctly reflected the site conditions and that Youngdale should proceed as planned. Moreover, that letter also contained a Cure Notice, for inadequate progress, indicating that Youngdale was in noncompliance with the contract because it had failed to prosecute its work diligently. Following thereon, the government sent a superseding Cure Notice on May 2, 1983, to plaintiff threatening termination for "failure to begin substantial performance of the contract." Therefore, as required by the government's Cure Notices, and in spite of the apparent adverse conditions at the site, Youngdale and its subcontractors attempted, once again, to clear and grub the site; however, they were again unsuccessful.

As a result of the foregoing, and in light of the government's pertinacious position as to the excess water condition at the site, Youngdale videotaped said site conditions on May 6, 1983, to buttress its position with respect to the disputed water differing site condition. The video depicted the mired equipment and the several potholes dug by Youngdale that immediately became filled with water within minutes of being dug. Tr. 146–156. Notwithstanding these conditions, Youngdale again required its subcontractor, Garcia Paving, to return to the job site and to continue working. Although the equipment continued to become mired in the mud, Garcia was able to make marginal progress through the earthwork for the building pads for Buildings "A" and "B." The parking and roadway areas, however, were completely saturated and were continuously pumping out water; thus, Garcia was unable to perform any significant work in these areas. Later, on May 24, 1983, Youngdale commenced excavation on Building "C"; however, excessive

---

5. According to the testimony at trial, no one visited the site prior to Youngdale's bid for the contract. Tr. 214–216.

moisture was encountered here as well, and Garcia was unable to proceed according to plan. Given the foregoing, and in accordance with the contract, Youngdale again notified the government of the aforementioned conditions; the government, however, merely ordered Youngdale to overexcavate the saturated areas.[6]

All of the foregoing facts and circumstances, as well as those *infra,* caused plaintiff to file what it deemed to be seven CDA claims with the contracting officer (CO). Such alleged claims were filed between May 26, 1983 and June 2, 1988. Each so-called claim will be briefly noted in its proper chronological order in the explication of other operative facts hereinafter in this section. However, in the Discussion section, *infra,* they will be discussed, as to their legal efficacy, en masse. There we find that only three of the seven claims are CDA bona fide.

On May 26, 1983, Youngdale submitted its first claim to the CO requesting a final decision as to entitlement with respect to the excess ground water condition. Said claim was not quantified. Youngdale also notified the government on May 26 and 27, 1983, that work was being performed out of sequence pending the government's direction as to how best to proceed given Youngdale's contention that it was unable to complete the earthwork phases of the roads, parking areas, embankments, and Building "C" due to the "too wet materials" found in these locations. To determine the best course of action, a meeting was held on May 31, 1983, between the government and Youngdale personnel, wherein the government verbally directed Youngdale to proceed with the overexcavation of Building "C" and that it would check into the removal of the material at the roadways and parking areas. In addition, on June 7, 1983, the government sent a Modification of Contract Performance, extending the time to perform the contract

by six days. PX 81. Youngdale returned said Modification unsigned on June 10, 1983. PX 84.

Two months later, on August 8, 1983, Youngdale submitted its purported second claim to the CO which requested $169,-556.00 in damages for the removal of the unsuitable material under the roadways and parking areas. Also during early August 1983, Youngdale commenced excavation for the sewer lines and, this time, encountered hard material. In view of such, Youngdale requested Sobhani Engineers, on August 16, 1983, to inspect what it contends to be another differing site condition, *i.e.,* a rock differing site condition. According to Sobhani, the alleged rock condition could not have been anticipated from the contract documents, and thus constituted a differing site condition under the contract. Based on this report, Youngdale notified the government, on August 17, 1983, that it had encountered rock during excavation for the utilities and that it considered said circumstance to constitute a differing site condition. In addition to the rock condition, Youngdale sent Serial Letter J099 indicating that the footings designated in the contract drawings may have a design deficiency. The government, on August 26, 1983, responded four days later stating that said claim with respect to the footings and masonry may have merit; however, with respect to the excess water condition, the government responded on August 30, 1983, indicating that it was still in the process of reviewing the alleged claim for differing site conditions, and did not expect to issue a decision until Youngdale provided the CO with a quantification of the claim. Youngdale, in turn, responded that its May 26, 1983 claim letter seeks a limited determination as to entitlement only, and not as to the amount of costs resulting from the alleged water condition.

During the course of construction of the project, Youngdale also requested that a second report be prepared, this time from

---

**6.** Later, however, it was denied by the defendant that Lt. Shultz, the representative of the Corps who had given the order to overexcavate, had any authority to do so. Therefore, defendant refused to give any direction with respect to the unsuitable material under Building "C." PX 70.

Pacific Geoscience, as to the correctness of the boring logs in depicting the alleged rock condition. On October 1, 1983, Pacific Geoscience issued its report opining that there was a significant amount of rock in subject area and that the boring logs did not appropriately reflect the actual conditions encountered. Thus, on December 22, 1983, Youngdale sent another letter notifying the government that it had encountered hard rock while excavating for the utilities. In spite of the foregoing, the government instructed Youngdale to proceed in accordance with the contract, and Youngdale, in turn, responded by submitting its third claim to the CO dated January 4, 1984, in the amount of $50,322.00 for the excavation of the rock.

Later, on January 10, 1984, Youngdale sent another serial letter to the government requesting direction as to the unsuitable materials under the parking and roadway areas, and further notifying the government that it intended to treat any delays resulting therefrom as delays attributable to the government's lack of direction with respect to said matters. As usual, the government merely instructed Youngdale to proceed with the contract as specified therein. Moreover, the government even went as far as to send Youngdale a letter (February 16, 1984) delineating what it considered to be Youngdale's quality control deficiencies, thereby essentially placing the blame for any added costs on Youngdale's shoulders, despite any apparent adverse site conditions. In any event, the government did modify its compaction requirements for the roadways and parking areas from 95% to 92.5% on February 23, 1984.

As for the alleged rock condition, the government emphatically stated in its letter of April 27, 1984, that the boring logs correctly depicted the actual site conditions and that Youngdale's claim of January 4, 1984 was invalid. The government then sent a letter to Youngdale dated June 18, 1984, regarding liquidated damages it intended to assess against Youngdale be-

cause of the protracted delay in the completion of the project. Said letter indicated that liquidated damages were to be assessed against Youngdale due to extended performance delays which according to the government effected overall job coordination and activities both on and off the critical path. Moreover, the government stated that "the net effect of this lack of performance and overall coordination is a failure to complete the contract within the construction period when all work could have been completed by the contract completion date." PX 148. Youngdale did not contemporaneously thereafter respond to said liquidated damages claim by the government; instead, it submitted a fourth claim to the CO, dated May 29, 1984, in the amount of $37,507.00, for added costs incurred for unsuitable soil under buildings.

Finally, after issuing an interim unsatisfactory Contractor Performance Evaluation on August 21, 1984, on December 19, 1984, the government accepted the project as substantially complete and forwarded a punchlist to Youngdale on January 2, 1985. On January 19, 1985, Youngdale left the job site, and the government sent an updated punchlist to the contractor on February 8, 1985. Next, on February 28, 1985, a Construction Contractors Evaluation report, which rated Youngdale's performance on the job as unsatisfactory, was forwarded. Notwithstanding said evaluation, Youngdale submitted its fifth claim to the CO on March 25, 1985, premised upon the alleged increased costs incurred as a result of the excess ground water differing site condition, *i.e.* $163,183.00. A year and a half later, on November 11, 1986, Youngdale submitted a consolidated claim (the sixth) which included all prior claims submitted, and added thereto any impact damages allegedly caused by the ground water differing site condition, removal of the unsuitable soil under buildings, roadways, and parking areas, the rock excavation, the inclement weather inefficiencies, all extended overhead costs, material and equipment storage costs, and out of sequence work costs. Said impact claim totaled $423,-

082.00,[7] which was when added to the direct cost claims in the amount of $420,568.00,[8] aggregated to a grand total of $843,650.00. Youngdale's seventh and final claim was submitted to the CO on June 2, 1988. Said claim also recapitulated all the previous claims, including that of November 11, 1986; accordingly, the only difference between the former and the latter claims were the plaintiff's calculations of its indirect costs, *i.e.*, its impact claim.[9] More specifically, in the June 2 claim, plaintiff's indirect costs increased to $454,637.00 from $423,082.00 as referenced in the November 11 claim, thereby establishing a new grand total of indirect and direct costs of $875,205.00.[10]

7.

### Summary of Impact Claims
### (PX 154)

| Description | Amount |
|---|---|
| Extended Overhead | $ 78,315.00 |
| Inclement Weather Inefficiency | 81,246.00 |
| Material & Equipment Storage | 6,430.00 |
| Out of Sequence Work | 216,620.00 |
| | $382,611.00 |
| 10% Profit | 38,261.00 |
| .525% Bond | 2,210.00 |
| Total Indirect Costs | $423,082.00 |

8.

### Summary of Direct Cost Claims
### (PX 154)

| Youngdale# | Date Submitted | Amount | Delay Days |
|---|---|---|---|
| CP–9, 14, 15 | 8/08/83 | $169,556.00 | 0 |
| CP–20 | 1/04/84 | 50,322.00 | 17 |
| CP–8 | 5/29/84 | 37,507.00 | 20 |
| CP–1 | 3/25/85 | 163,183.00 | 90 |
| Total Direct Costs | | $420,568.00 | 127 |

9.

### Summary of Direct and Indirect Costs
### (PX 159)

Direct Costs:

| Youngdale# | Date Submitted | Amount | Delay Days |
|---|---|---|---|
| CP–9, 14, 15 | 8/08/83 | $169,556.00 | 0 |
| CP–20 | 1/04/84 | 50,322.00 | 17 |
| CP–8 | 5/29/84 | 37,507.00 | 20 |
| CP–1 | 3/25/85 | 163,183.00 | 90 |
| Total Direct Costs | | $420,568.00 | 127 |

Indirect Costs:

| Description | Amount |
|---|---|
| Extended Overhead | $ 81,903.00 |
| Inclement Weather Inefficiency | 95,132.00 |
| Material & Equipment Storage | 5,925.00 |
| Out of Sequence Work | 228,188.00 |
| | $411,148.00 |
| 10% Profit | 41,115.00 |
| .525% Bond | 2,374.00 |
| Total Indirect Costs | $454,637.00 |
| Grand Total | $847,414.00** |

**See note 10.

10. On June 2, 1988, Youngdale resubmitted its impact claim with the CO; therein, Youngdale recalculated its impact damages and came up with a total claim of $847,414.00. However, this amount was added incorrectly, in that, $420,568 of direct costs and $454,637 of indirect

Following the filing of the foregoing claims, the government paid Youngdale, on June 17, 1988, $2,666,526.00, the contract price [11] less $46,750 in liquidated damages for 187 days of alleged contractor delays.[12] To date, the CO has failed to issue a final decision on Youngdale's November 11, 1986 and June 2, 1988 claims. Consequently, Youngdale filed this action on September 19, 1988, seeking damages for the alleged differing site conditions, as well as the release and payment of the $46,750.00 in liquidated damages withheld by the government.[13]

With regard to the liquidated damages claim, the government did not obtain a CO's decision with respect to said claim until July 24, 1990, more than two years after final payment was received.[14] Moreover, the day after the CO's final decision granting liquidated damages to the government, i.e., July 25, 1990, the government made a judicial admission as to liability with respect to the excess ground water condition. Based on the foregoing, Youngdale, on November 27, 1990, requested that the CO reconsider his decision with respect to the $46,750 in liquidated damages on the grounds that "he had not reviewed YOUNGDALE'S position in the matter prior to rendering his decision as required by law nor had he taken into account that the government had conceded in this litigation that delays were caused by the perched water condition at the site." The CO, however, to date has not responded to Youngdale's request for reconsideration of the government's liquidated damages claim.

## CONTENTIONS

### A. PLAINTIFF

#### 1. *Water and Unsuitable Material*

Youngdale contends in its complaint that the excess water condition encountered at the site constituted both Type I and Type II differing site conditions, in that (i) the plans and specifications were materially different from the conditions actually encountered at the site, i.e., a Type I condition, and (ii) the excessive *abnormal* rainfall coupled with the unanticipated moisture-retentive nature of the soils resulted in quagmire-like conditions, i.e., a Type II condition. Moreover, Youngdale avers that it has incurred severe and "ruinous" damages as a result of the defendant's failure to timely recognize and acknowledge the "excess water" condition, correct the plans, and direct Youngdale to remove the unsuitable material under the buildings, roadway, and parking areas.

#### 2. *Rock*

Youngdale also contends that it is entitled to be compensated for additional costs due to the unexpected rock encountered during construction. First, Youngdale avers that the rock condition constitutes a Type I differing site condition in that (i) the subsurface conditions it encountered were materially different from those depicted in the contract; (ii) these conditions were not reasonably anticipated; and (iii) Youngdale relied on its interpretation of the defendant's plans and specifications. Further, Youngdale avers that the rock condition also constitutes a Type II differing site condition in that (i) it was unaware of the presence of the subsurface rock at the time the contract was entered into; (ii) it could not have anticipated the rock condition from looking at the site; and (iii) it is abnormal to encounter "pervasive cementitious" rock at depths of 1 to 4 feet in similar-type contracting work.

#### 3. *Damages*

Next, Youngdale contends that in addition to the actual damages due it by the government with respect to both the water

costs totals $875,205.00, not $847,414.00. Note that both the plaintiff and the defendant utilize the corrected figure in their respective post-trial submissions.

11. The original contract price was $2,693,800. However, this figure was later modified by the government in Modification Nos. P00001–P00004. Thus, the total modified contract amount was $2,713,276.00.

12. Liquidated damages were assessed at $250.00 per day × 187 days, which equals $46,750.00.

13. Youngdale did not file a claim with the CO for the $46,750 in liquidated damages.

14. The decision of the CO herein only reaffirms the previously-stated reasons for assessing liquidated damages against Youngdale.

and the rock differing site conditions, plaintiff is also entitled to delay and impact damages totaling 290 days due to, *inter alia,* the numerous delays caused by the government's failure to recognize and respond to plaintiff's timely notification of the water and rock differing site conditions,[15] *i.e.,* loss of productivity and accelerated work schedules. Plaintiff further avers that in calculating the amount of damages due from the government, it is entitled to utilize the "total cost method." In the event that the court does not agree with Youngdale's contentions that it is entitled to determine damages pursuant to the total-cost method, then plaintiff contends that it is entitled to an equitable adjustment calculated pursuant to either the modified total cost method, the productivity comparison method, the estimated evaluation method, the jury verdict method, or the cost plus method.

#### 4. *Interest*

In essence, Youngdale contends that pursuant to established case law, it is entitled to interest from the date it filed its initial *certified claim* with the CO, *i.e.,* May 26, 1983, notwithstanding the fact that the claim lacked quantification or a sum certain.

#### 5. *Liquidated Damages*

Finally, Youngdale contends that the government wrongfully withheld liquidated damages in the amount of $46,750 on subject project without first obtaining a CO's

decision, as required by the contract provisions and Federal Acquisition Regulation (FAR) 33.206(b).[16] In addition, Youngdale avers that (i) the CO's decision was arbitrary and capricious, in that it was not rendered until two years after the assessment of liquidated damages; (ii) the CO's decision is ineffectual because he failed to grant Youngdale the opportunity to reply to the government's claim; and (iii) the government's wrongful assessment is in violation of the terms of the contract and the Prompt Payment Act. Youngdale further avers that it is entitled to said wrongfully-withheld liquidated damages, plus *interest,* under both the Prompt Payment Act and the CDA.

### B. DEFENDANT

#### 1. *Water and Unsuitable Material*

The government judicially admitted on July 25, 1990, that Youngdale is entitled to an equitable adjustment with respect to the "excess water" condition.[17] However, the government does not define with any specificity exactly what it deems to be included within its concession to the "excess ground water" condition. The court observes that the plaintiff, in this connection, contends that the unsuitable soil under the roadways, parkways, and buildings are within the ambit of the defendant's concession and that the defendant has not averred anything to the contrary, despite its opportunity to do so in its post-trial submissions.

---

**15.** Note that the water differing site condition was present from the inception of the construction project and existed throughout. Moreover, the government was aware of the "excess water" condition from the very beginning. Jt.Stip. of Facts, p. 2.

**16.** In Plaintiff's Post–Trial Brief In Support Of Claim For Payment Of $46,750 Plus Interest, plaintiff cites to the following contract provisions:

DISPUTES
(c)(iii) ... *A claim by the Government against the Contractor shall be subject to a decision by the Contracting Officer.* (emphasis as added therein).
Furthermore, FAR 33.206 provides in pertinent part:

Initiation of a claim....
(b) The Contracting Officer shall issue a written decision on any government claim initiated against a contractor.

**17.** Joint Exhibit (JX) 1 is entitled Joint Statement of Issues of Fact and Law. Therein defendant and plaintiff state the following:

Defendant does not contest that the existence of excess ground water on the site constituted a differing site condition, the existence of which plaintiff J.R. Youngdale Construction Company ("Youngdale") properly, promptly, brought to the attention of the U.S. Army Corps of Engineers ("Corps"). Accordingly, Youngdale is entitled to contract damages, pursuant to the Differing Site Conditions clause of its contract with the Corps.

## 2. *Rock*

On the other hand, the government contends that, at trial, Youngdale failed to carry its burden and establish that the existence of rock constituted a differing site condition. Specifically, the government avers that its decision to describe the subsurface conditions in terms of "Soils" rather than "Rock" does not, *ipso facto*, entitle Youngdale to compensation pursuant to the differing site conditions clause in the contract. Moreover, the defendant avers that Youngdale failed to prove the six elements required by this court as a condition precedent in establishing a Type I differing site condition. *See Weeks Dredging & Contracting, Inc. v. United States*, 13 Cl.Ct. 193 (1987), *aff'd*, 861 F.2d 728 (Fed.Cir. 1988). The government, however, does not address Youngdale's contention that the alleged rock condition constitutes a Type II condition, in addition to a Type I condition.

## 3. *Damages*

Because Youngdale bears the burden of establishing, by a preponderance of the evidence, the amount of its equitable adjustment, defendant contends that Youngdale is *not* entitled to utilize the total-cost method of recovery in computing its damages since it failed to prove the operative facts necessary to utilize said method. That is, the government contends that Youngdale failed to establish that (i) it actually incurred the costs alleged; (ii) its added costs were *solely* due to government delay; and (iii) its bid was realistic. Additionally, the government avers that Youngdale's calculation of its damages fails to account for any government modifications to the contract which were previously paid to it by the government. Lastly, the defendant avers that Youngdale is also not entitled to utilize the jury verdict method of calculating damages, but instead, must utilize the direct (specific) cost recovery method.

## 4. *Interest*

Defendant next contends that Youngdale is *not* entitled to interest on any equitable adjustments from May 26, 1983, but rather it is entitled to recover interest under the CDA *only* from the date the CO received Youngdale's duly *certified* and *quantified* claims. Specifically, the government claims that (i) if the court awards damages up to and including $163,183, Youngdale is entitled to interest on and up to said amount from March 25, 1985; (ii) if the court awards damages in excess of $163,-183, but not in excess of $420,568, Youngdale is entitled to interest on said amount from November 11, 1986; and (iii) if the court awards damages that exceed $420,-568, then Youngdale is entitled to interest on such excess from June 2, 1988, only.

## 5. *Liquidated Damages*

Essentially, the defendant contends that it is entitled to retain the liquidated damages under the subject contract because Youngdale, not the government, delayed the project 187 days beyond the completion date.

## ISSUES AND CONCLUSIONS

### 1. *Water*

There is no issue as to liability with respect to the "excess water" differing site condition, as the government has *conceded* liability with respect to this issue.

### 2. *Unsuitable Material Under The Buildings, Roadway, And Parking Areas*

The question herein is—whether the unsuitable material condition is to be included in the government's concession as to the "excess ground water" different site condition. Given that the government failed to address said issue in its post-trial submissions, and that the government acknowledged the existence of the unsuitable material, we deem said issue to be a non-issue and, therefore, it is subsumed within the water different site condition.

### 3. *Rock*

The issue here is—whether the rock as alleged by Youngdale constitutes a differing site condition, *i.e.*, Type I and/or Type II. After a careful review of the evidence adduced at trial, as well as the parties'

post-trial briefs, we conclude that Youngdale has failed to satisfy the six elements required to establish a Type I differing site condition. Further, we find that Youngdale has also failed to establish the requisite elements necessary for a Type II differing site condition claim. Consequently, we find, *infra*, that the government is not liable with respect to any additional costs associated with Youngdale's alleged rock claim.

### 4. *Damages*

The threshold issue herein is—whether Youngdale is entitled to utilize the total-cost method to prove its damages with respect to the "excess ground water" different site condition. If it is not so entitled, then the question becomes—under what theory of recovery is Youngdale entitled to determine its damages, *i.e.*, the modified total-cost method, the productivity comparison method, the estimated evaluation method, the jury verdict method, the cost plus method, or the direct cost method. Based on the evidence adduced at trial, and the various theories of recovery posited in the parties' post-trial submissions, we hold that Youngdale is *not* entitled to recover damages under the total-cost method, but rather is entitled to recover damages under the direct cost method. A discussion of the court's analysis as to the proper method of calculating damages on this record is addressed, *infra*.

### 5. *Interest*

To the extent that Youngdale has established liability for a different site condition on the part of the government and is able to appropriately prove damages by one of the above-referenced methods, the remaining threshold issue is—what is the earliest date from which Youngdale may properly accrue interest under the CDA. Two subissues are (i) whether Youngdale must simultaneously submit a duly certified *and* *quantified* claim to the CO before it is entitled to accrue interest; and (ii) given the fact that Youngdale submitted several claims, whether interest will run as to each claim independently, or from the date of the initial efficacious claim, although it may not have contained *all* theories of recovery of the optimum amount.

According to the bright-line rule, under § 611 of the CDA, interest accrues from the date the CO receives the properly certified claim pursuant to 41 U.S.C. § 605(a) until payment thereof. A properly certified claim is one that is not only certified but also contains a request for a sum certain. *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987). Thus, Youngdale's *unquantified* or uncertified claim is not a proper claim upon which interest will accrue, *i.e.*, here interest will not run from May 26, 1983, as averred by Youngdale. However, § 611 does award interest on any amounts *later* found due from the date the CO receives the certified and quantified claim. *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 862 (Fed.Cir.1991). Therefore, defendant's contention that Youngdale is entitled to interest only up to and including the amount of each claim from the date submitted to the CO is without merit. We will address this substantive issue in detail, *infra*.

### 6. *Liquidated Damages*

The primary issue with respect to the refund of the liquidated damages claim of the plaintiff is—whether, under subject contract provisions, the government is entitled to retain the $46,750 withheld from Youngdale. Within this threshold question, there is also a secondary issue, namely—whether the government is required to obtain a CO's decision *prior* to withholding any such sums otherwise due the plaintiff. We conclude, given this record, that the government is not entitled, as a matter of law, to liquidated damages in any amount. Moreover, with respect to the issue of—whether the government must first obtain a CO's decision prior to assessing liquidated damages—the court abstains from addressing said issue at this time, given our foregoing ruling that liquidated damages are inappropriate as to any matters contained herein.

## DISCUSSION

### A. LIABILITY

#### 1. *Overview*

At the outset, the court noted herein that with respect to both the alleged excess water differing site condition and the rock differing site condition, Youngdale contends that a Type I *and* a Type II differing site condition exist.[18] Accordingly, after a brief overview of relevant law pertaining to differing site conditions, we shall discuss, in detail, the requirements for each type of differing site condition, *i.e.*, Type I and Type II, seriatim.

Traditionally, one of the major risk factors experienced and considered by contractors when determining the amount they should bid on a particular construction project is the type or nature of subsurface or other latent physical condition that may be encountered during the construction of the project. John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 368 (2d ed. 1985). Therefore, to avoid any "padding"[19] of the contract price by the contractors and to, at the very least, remove some of the gamble in bidding, the government has provided the Differing Site Conditions clause contained in 41 C.F.R. § 1–7.602–4 (1976) as an ameliorating factor.[20] Said clause states in pertinent part that:

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, or unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving notice. If the conditions do so materially differ and cause an increase or decrease in the contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed unless the Contractor has given the written notice required; provided, that the time prescribed in (a) above for giving written notice may be extended by the Contracting Officer.

In addition to the Differing Site Conditions clause, the government has also sought to further reduce the contractor's need to include contingencies in its bidding by either furnishing the bidders, or allowing them to examine, the information it possesses concerning the site.[21] Cibinic & Nash, *Administration of Government Contracts* 368. In fact, the government even encourages bidders to make reasonable site investigations to reduce the risk

---

**18.** Whether a Type I or Type II condition exists with respect to the excess water condition is irrelevant, given the government's concession of liability. However, the question remains an important one with respect to the rock condition allegedly encountered.

**19.** "Padding" of the contract may occur when the *contractor* attempts to allocate some of the risk for delays or increases in costs of performance due to any latent or subsurface conditions discovered during performance of the contract which were generally not accounted for in the original bid estimate. As a result, such contingency bidding by the contractor works against the government, in that it is unable to obtain the best possible price for the construction project.

**20.** In 1983, 41 C.F.R. § 1–7.602–4 (1976) was in effect. It was subsequently amended and reclassified in 1984, under Title 48, Code of Federal Regulations § 52.236–2. Said amended regulation is identical to the 1976 regulation, with the exception of the addition of section (d).

**21.** Generally, the government is in a better position to provide the contractor with the necessary information about site conditions, given the fact that it has already taken the time to design the project, make its own borings, as well as investigate and evaluate the site prior to submitting the project for bidding.

of "unexpected unfavorable conditions [on the part of the contractor] while protecting the government if the conditions encountered turn out to be more favorable than should have been expected." *Id.* In light of the foregoing precautions granted to the contractor, the regulations and related case law have established that recovery under the differing site conditions clause shall be appropriate only with respect to two types of conditions, *i.e.*, a Type I or a Type II differing site condition. The first condition provided by the regulations is a "Type I" differing site condition which is defined as "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract." 41 C.F.R. § 1–7.602–4(a)(1). That is to say, a Type I differing site condition is dependent upon whether a contractor can prove by a preponderance of the evidence that he has encountered a subsurface or latent physical condition *differing materially* from the conditions which are indicated in the contract documents or may be implied from other language in the contract documents. *See Weeks Dredging & Contracting, Inc. v. United States,* 13 Cl.Ct. 193, 218 (1987), *aff'd,* 861 F.2d 728 (Fed.Cir.1988); Cibinic & Nash, *Administration of Government Contracts* 379. More specifically, this court has previously held in *Weeks* that with respect to a Type I differing site condition there are *six* indispensable elements which must be established by the plaintiff:

> (i) the contract documents must have affirmatively indicated or represented the subsurface conditions which form the basis of the plaintiff's claim;[22] (ii) the

contractor must have acted as a reasonably prudent contractor in interpreting the contract documents;[23] (iii) the contractor must have *reasonably* relied on the indications of subsurface conditions in the contract;[24] (iv) the subsurface conditions actually encountered, within the contract site area, must have differed *materially* from the subsurface conditions indicated in the same contract area;[25] (v) the actual subsurface conditions encountered must have been reasonably unforeseeable;[26] and (vi) the contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface conditions within the contract site.[27]

*Weeks,* 13 Cl.Ct. at 218 (citations omitted) (emphasis as noted in the original).

The second type of differing site condition prescribed by the regulations is Type II which occurs when the contractor encounters "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." 41 C.F.R. § 1–7.602–4(a)(2). Specifically, the *Servidone* court has held that the plaintiff must satisfy three elements to establish said condition before it is entitled to recover, *i.e.*, the plaintiff must establish that—(i) it encountered an unknown physical condition; (ii) the condition was unusual; and (iii) the condition differed materially from those ordinarily encountered and generally recognized as inhering in the work of the character provided for in this contract. *Servidone Con-*

---

22. *See P.J. Maffei Building Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984); *United Contractors v. United States,* 177 Ct.Cl. 151, 161, 368 F.2d 585, 595 (1966).

 With regard to the term "contract documents," the Court of Claims has expansively interpreted said term to include not only the bidding documents (Invitation for Bids, drawings, specifications and other documents physically furnished to bidders), but also documents and materials referred to in the bidding documents. *See Hunt & Willett, Inc. v. United States,* 168 Ct.Cl. 256, 351 F.2d 980 (1964).

23. *See Foster Construction Co. v. United States,* 193 Ct.Cl. 587, 600, 435 F.2d 873 (1970).

24. *See Sanders Construction Co. v. United States,* 220 Ct.Cl. 639, 640, 618 F.2d 121 (1979); *Pacific Alaska Contractors, Inc. v. United States,* 193 Ct.Cl. 850, 864, 436 F.2d 461 (1971).

25. *See P.J. Maffei,* 732 F.2d at 916; *Arundel Corp. v. United States,* 207 Ct.Cl. 84, 105, 515 F.2d 1116 (1975).

26. *See Stuyvesant Dredging Co. v. United States,* 11 Cl.Ct. 853, affirmed, 834 F.2d 1576 (1987).

27. *See William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir.1984). For a complete discussion of element 6 herein, see the "Damages" section of the opinion.

struction Co. v. United States, 19 Cl.Ct. 346, 360 (1990). See generally Vann v. United States, 190 Ct.Cl. 546, 572, 420 F.2d 968 (1970); Kaiser Industries Corp. v. United States, 169 Ct.Cl. 310, 315, 340 F.2d 322 (1965); Loftis v. United States, 110 Ct.Cl. 551, 76 F.Supp. 816 (1948).

In connection with entitlement under either of the foregoing types of differing site conditions, we stated the following in Weeks:

> ... a differing site condition claim stands or falls upon what is indicated in the contract documents.
>
> \* \* \* \* \* \*
>
> Where the contract contains no affirmative ... representation of the subsurface conditions, purportedly relied on by the contractor, the government has no liability.

13 Cl.Ct. at 219 (citations omitted) (emphasis added). Conversely, we hasten to add by analogy that where the contract contains affirmative indications and representations of the subsurface conditions, which indications were in fact encountered and the contractor, as here, failed to rely on said accurate contract depictions, we also hold that the government has no liability.

Thus, given the foregoing well-established general principles for determining compensable differing site conditions, we shall now turn to the operative facts presently before the court.

### 2. Water And Unsuitable Material

■ As previously stated above, Youngdale has taken the position that the unsuitable material under the buildings, roadway, and parking areas, sometimes described as "overly wet material" or "a layer of silty clay," is synonymous with the "excess ground water claim" and, therefore, the government's concession as to the existence of a "differing site condi-

tion" is inclusive. In examining the government's position with respect to this contention, the court observes that the government fails to address this issue in its post-trial submissions.[28] Given this record, there has been no direct acceptance or rejection by the government as to plaintiff's position that the unsuitable soil materials found under the roadways, parkways, and buildings is one and the same condition as that of a different site condition stemming from excess ground water. However, in a letter dated September 28, 1983, which was admitted into evidence as PX 118, the government indicated therein that "[t]he existing soil conditions at the entry drive and the north portion of the parking lot for the Visiting Officers' Quarters are unstable, due to a layer of silty clay encountered approximately 12 inches below the existing ground." Thus, given the government's acknowledgment of the "silty clay" and its lack of response to the aforementioned issue in its post-trial briefs, the court finds that based on (i) the plaintiff's characterization of the unsuitable material as "overly wet material" or "a layer of silty clay" throughout the construction of the project, as well as during the proceedings herein; (ii) the defendant's characterization of the unsuitable material as "a layer of silty clay" in its letter to the plaintiff on September 28, 1983 (PX 118); and (iii) the fact that the government has tacitly admitted that the unsuitable soil condition is, in fact, a non-issue, by neither addressing it at trial nor in its post-trial submissions as a separate different site condition from that of the excess ground water, the unsuitable soil condition, supra, is one and the same as that stemming from the "excess water condition," which existed throughout the site and construction of the project.[29] Therefore, the government's concession that "Youngdale encountered a groundwa-

---

**28.** According to the defendant, the only issue remaining with respect to the excess water condition is that of damages, i.e., whether plaintiff is entitled to obtain damages under the total-cost method or some other theory of recovery.

**29.** In addition to the foregoing, in the video of the project area which was admitted into evi-

dence as PX 53, one of the gentleman therein specifically pointed out the excess water condition in the parking, building, and roadway areas. Tr. 146–156. Moreover, Mr. Gaber also testified at trial that the roadways and the parking areas were saturated with water. Tr. 169.

**530**

ter differing site condition," [30] during construction of the project is hereby deemed to *include* that of the unsuitable soil condition found in the roadways, buildings, and parking areas. In view of the admitted liability of the government with respect to the excess ground water differing site condition, we now turn to the issue of liability with regard to the alleged rock differing site condition.

### 3. *Rock*

■ According to the plaintiff, the alleged rock encounter constituted both a Type I and a Type II differing site condition. As previously stated herein, to meet its burden, plaintiff must prove by a preponderance of the evidence six conjunctive elements with respect to a Type I condition, and three conjunctive elements with respect to a Type II condition. We will now address each condition in turn.

### (a) TYPE I—DIFFERING SITE CONDITION

#### (i) *Express Contract Indications*

First, with respect to a Type I condition, the plaintiff must prove that the government affirmatively indicated or represented the subsurface conditions on which the basis of plaintiff's claim is formed. *Weeks*, 13 Cl.Ct. at 219. *See Pacific Alaska*, 193 Ct.Cl. at 869, 436 F.2d 461; *P.J. Maffei*, 732 F.2d at 916; *Stuyvesant Dredging*, 11 Cl. Ct. at 858, affirmed, 834 F.2d 1576.[31] Where the contract is silent on this point, a claim cannot arise. *Ragonese*, 128 Ct.Cl. at 159, 120 F.Supp. 768; *S.T.G. Construction Co. v. United States*, 157 Ct.Cl. 409 (1962).

When construing plaintiff's contract, it is the court's charge to interpret said contract within the framework and guidelines delineated by the Federal Circuit and our predecessor Court of Claims. *Weeks*, 13 Cl.Ct. at 219. In accordance with this mandate, we are required to view plaintiff's case as

if "this court [were] stepping 'into the shoes of a 'reasonable and prudent' contractor' to decide how 'such a contractor would act in [the plaintiff's] situation.'" *Weeks*, 13 Cl.Ct. at 219 (citing *P.J. Maffei*, 732 F.2d at 917, quoting *H.N. Bailey & Associates v. United States*, 196 Ct.Cl. 156, 449 F.2d 387, 390 (1971)). Further, we are to note that "contract indication[s] need not be explicit or specific ... so long as they provide sufficient grounds by which the contractor can justify his expectation of latent conditions materially different from those encountered." *P.J. Maffei*, 732 F.2d at 916. Against this background, we now look to the contract documents in the instant case to assess whether they assert, directly or indirectly, the character or nature of the subsurface materials that would reasonably be expected to be found by Youngdale at the site.

The operative facts herein establish that the contract contains 10 boring logs describing the subsurface materials that were extracted from the area. Of the 10 holes drilled, only three boring logs, *i.e.*, #23, #24 and #25, were done in the construction area because the location of the construction site was changed prior to the commencement of the contract. *See also* attached Appendix–A. With regard to the information contained in the relevant boring logs, *supra*, the left side vertical axis of each of the logs depicts the depth of the boring, and the second column to the left within the chart provides the N-value, or the results of the standard penetrometer tests. Youngdale's expert witness, Mr. James Michael Sims, testified that the standard penetrometer test indicates the hardness of the materials encountered, *i.e.*, a standard penetration test refers to the use of a 140–pound hammer free-falling over a 30–inch drop which strikes an anvil that is on top of a rod that is attached to a sampler at the bottom of the hole. The record of that sampling is reported as "blows per

---

**30.** Defendant's response to plaintiff's post-trial brief.

**31.** The differing site conditions clause cannot be invoked "if the plans and specifications do not 'show' or 'indicate' anything about the alleged unforeseen condition, *i.e.*, if they say 'nothing

one way or the other about subsurface [conditions].'" *United Contractors v. United States*, 177 Ct.Cl. at 161, 368 F.2d at 595 (citing *Ragonese v. United States*, 128 Ct.Cl. 156, 159, 120 F.Supp. 768, 769 (1954)).

foot," *i.e.*, the number of blows it takes a 140-pound hammer to drive a sampler one foot through the material being sampled; this is ultimately referred to as the N-number on the boring logs. In addition to this information, on the right-hand side of the log sheet is a box containing the standard penetrometer descriptive data. Said data explains the meaning of the numbers and letters in the N-value column, in addition to indicating the type of material encountered as it is classified under the Uniform Soils Classification System (USCS). Youngdale's expert witness testified that to a "reader [who] is knowledgeable in standard penetration testing, it [the standard penetrometer test results] gives him an *indication* of the hardness of the materials encountered." Tr. 1354 (emphasis added). For example, according to Mr. Sims testimony, a "blow count" in excess of 31 with regard to cohesive materials, indicates that the material is either "stiff or hard." Tr. 1357. With respect to cohesionless material, a blow count in excess of 50 would indicate "very dense" material, and a blow count of 51 or higher (or if the material was cohesive and the blow counts exceed 30) would indicate "very hard or stiff" material. Tr. 1358. Lastly, a blow count in excess of 100 would clearly indicate what is referred to as "refusal." Refusal is used when 50 blows of the hammer fail to achieve six inches of penetration, or in other words, 100 blows fail to achieve a penetration of a foot. On the boring logs, refusal is noted by using the letter "R" in the N-column. According to Mr. Sims, materials such as soft cement, cemented sand, or a car body would be hard enough to cause refusal.

As to the specific details contained within each log, Mr. Sims testified that in boring log # 23, the N-column of the boring log indicated that the following blow counts were achieved: "36," "R"-refusal, "A"-attempt, "56," "85," "R"-refusal, "79," and finally "R"-refusal. Tr. 1358. With respect to the descriptive data contained in boring # 23, between 0'–2', the log described the material sampled as "sandy clay, light brown, low plasticity fines, 40–45% fine to medium grained sand, some organic material (hair roots, etc.), *some shale fragments;* between 2'–2.5', clayey sand, very fine to medium grained sand; between 2.5'–5', clayey sand, graded sand, gravel to ¾" size, *cemented;* between *4'–5' depth, highly weathered monterey shale;* between 5'–8', gravelly sandy clay, light gray, graded sand, gravel to 1" size, *layers of monterey shale;* between 6'–14', gravelly clayey sand, yellow-brown, 30–35% high plasticity fines, 45–50% medium to course grained sand, 15–20% hard angular gravel to ¾" size, *gravels are highly weathered shale fragments* with iron staining (field) and at 12.5" depth, some rounded gravels to ½" size (field); and lastly, between 14'–14.9', the material sampled was described as clayey silt, light brownish-gray, slightly damp, *cemented,* some iron staining.[32]

---

**32.** *Boring log # 24* contained the following information:

Blow Counts: "18," "28," "59," "A," "A," "R," "A".

Descriptive Data:
–From 0'–2.6'—"Sandy clay, light-brown, medium plasticity fines, 40–45% medium grained sand, some organic odor and material (roots, etc.)—(field)."
–From 2.6'–5.5'—"Sandy clay, dark-brown, graded sand, some iron staining."
–From 5.5'–11.0'—"Clayey sand, yellow-brown, 30–36% medium plasticity fines, graded sand, *2 pieces of 1" sandstone.*"
–From 11.0'–15.0'—"Sand, gray-brown, damp, low plasticity fines, fine to coarse graded sand, *some shale fragments.*"
"At 13.5' depth, scattered gravels to ¾" size."
*Boring log # 25* contained the following information:

Blow Counts: "7," "18," "R," "R," "R," "59," "57."
Descriptive Data:
–From 0'–3'—"Silty sand, light-brown, 35–40% non-plasticity to low plasticity fines, fine to medium grained sand, organic odor and material (roots, etc.)—(field)."
–From 3'–4'—Clayey sand, brownish-gray, very fine to medium grained sand."
–From 4'–4.5'—"Sandy clay, dark brownish-gray, sand, medium plasticity fines, fine grained sand."
–From 4.5'–12'—"Clayey sand, light-brown, very fine to coarse graded sand (mostly very fine grained), gravel particles mostly ¾"–1" size, *cemented layers.*"
–From 12'–15.5'—"Sand, light-brown, damp, low plasticity fines, very fine to fine grained sand, some pea-sized gravels."

With respect to the foregoing, on direct examination Mr. Sims, plaintiff's expert geologist, testified as follows:

Q. Would you define Monterey shale, sir?

A. Monterey shale is a sedimentary rock.... [Tr. 1318] [33]

\* \* \* \* \* \*

Q. Would you call cemented sand a rock?

A. Not in all cases. [Tr. 1355].

Consequently, given the foregoing geological data contained in the three relevant boring logs and the corroborative testimony of plaintiff's own expert with respect to the information contained in those borings, it is clear to the court that the government has made a reasonably accurate positive representation as to the character and nature of the subsurface materials expected to be encountered and where they may be found, given the location of each of the borings.[34] *See Weeks*, 13 Cl.Ct. at 220–21. Moreover, even plaintiff posits in its post-trial memoranda (at p. 41), that *"where the contract plans and specifications contain boring logs, the courts generally hold that such logs are affirmative representations by the government of subsurface conditions,"* citing *Foster*, 193 Ct.Cl. at 606, 435 F.2d 873; and *United Contractors*, 177 Ct.Cl. at 165, 368 F.2d 585. In addition, the record shows that the soil boring logs used the USCS in describing the subsurface conditions. Thus, it is clear beyond cavil that the first element of the test has been established by the plaintiff, in that the contract boring logs do in fact indicate a clear and positive representation of the subsurface conditions that a contractor could reasonably expect to encounter.

### (ii) *Reasonableness of Plaintiff's Interpretation of the Contract Indications*

The plaintiff avers that the contract boring logs do not *accurately* depict the conditions as existed at the site; in other words, the contention is that the government submitted defective specifications to the bidders. Plaintiff further implies that the "Final Geotechnical Report" prepared by the Foundations and Materials Branch of the Corp of Engineers ("COE") dated July 26, 1982, misrepresented to the plaintiff the fact that there was no rock at the site. According to the plaintiff, said misrepresentation stems from the following facts: (1) the report indicates that laboratory test results show that the soils were classified as "sandy clay (CL and CH), clayey sand (SC and SC–SM), silty sand (SM), gravelly clayey sand (SC), and gravelly sandy clay (CH)...."; and (2) the Guide Specifications contained in said report state in section:

b. CE 02201, "Excavation, Filing and Backfilling for Buildings." *Delete references to rock excavation.*

c. CE 02221, "Excavation, Trenching, and Backfilling for Utilities Systems." *Delete references to rock excavation.* Under structures and roadways, compact materials to 95%. All other areas compact materials to 90%.

d. CE 02230, "Excavation, Embankment and Preparation of Subgrade for Roadways." *Delete references to rock excavation.* Compact materials to 95%.

(emphasis added). Finally, plaintiff's expert witness report opines that "the logs do not appropriately reflect the actual conditions encountered." PX 119.

Defendant, on the other hand, strongly asserts that said boring logs clearly and accurately depict the conditions actually encountered. Defendant avers that the real issue herein is whether the government was correct in choosing to describe the subsurface conditions as "soils" rather than "rock." In any event, the government points out that it explicitly stated in Boring # 23 that rock, *i.e.*, monterey shale,

---

**33.** Moreover, the parties stipulated to the definition of "Monterey shale" as follows: "Sedimentary *rock* that was deposited in layers in a deep sea environment between five and fifteen million years ago. The formation is several thousand feet thick." (emphasis added). Joint Stipulated Glossary of Technical Terms filed on December 10, 1991.

**34.** See Appendix–A for a map of the construction site including the location of the three relevant boring logs, *i.e.*, Borings # 23, # 24, and # 25.

existed below the surface at depths of 2.5 feet to 5 feet, and shale fragments from 0 feet to 2 feet. Moreover, Boring # 24 indicated that there were shale fragments at depths of 11–15 feet, and, most importantly, the government avers that a reasonably prudent contractor in interpreting the boring logs would have been on notice to the fact that very dense and hard materials were present, despite the government's classification, in light of the fact that standard penetration data clearly indicated that there were *refusals, i.e.,* see the N-value column, following very high blow counts. In said column, Boring # 23 indicated that the government encountered *refusal* on three separate occasions; in Boring # 24 *refusal* was indicated at least once; and in Boring # 25 *refusal* was indicated in three instances.

As stated previously, "our standard is to judge the plaintiff's 'reasonableness,' in interpreting contract indications, from the perspective of a reasonable and prudent contractor acting under similar conditions." *See Weeks*, 13 Cl.Ct. at 224; *Maffei*, 732 F.2d at 916. With respect to the question whether plaintiff's responsible agents even looked at the boring logs prior to the bid, the following cross-examination of plaintiff's geologist is pertinent:

Q. ... would you be concerned ... if I told you that on this job we haven't heard testimony from anyone that looked at the boring logs before the contract was awarded?

A. (No response.)

Q. Do you think a reasonable contractor should look at the boring logs before they bid the contract?

A. Of course, I do, yes. [Tr. 1359]

Q. If the contractor told you the[y] had never looked at the boring logs before they bid, and then after they bid ... they told you that the boring log didn't have the word rock [in it], [and] ... the blow counts showed ... very hard material. Do you think that ... contract[or] was deceived by the Government before they bid ...?

A. No. [Tr. 1360].

Pertinent to the foregoing, Messrs. Gaber, and Manka, on-site superintendent, testified,[35] on cross-examination, respectively, as follows:

Q. Did you review the boring logs prior to the submission of Youngdale's bid?

A. No, I didn't. [Gaber Tr. 479].

\* \* \* \* \* \*

Q. Did you review the boring logs in bidding this contract?

A. ... No.

Q. Do you know if anyone in your office reviewed the boring logs?

A. I don't. No. [Manka Tr. 215].

Against this background, we are compelled to conclude that plaintiff is presently unreasonable in its belated interpretation of the contract documents in light of the clear and unmistakable indications in Boring logs # 23, # 24, and # 25,[36] and it was also grossly unreasonable and negligent in its failure to examine the boring logs prior to its bid. This conclusion, on this record, is indisputable inasmuch as inspection of said boring logs would have put a reasonable and prudent contractor on notice of the existence of rock beneath the surface and, therefore, would have required that contractor to investigate the site prior to bidding. The well-established principle is true that a contractor is not required "to discover *hidden* subsurface conditions or those beyond the limits of an inspection appropriate to the time available." *Foster*, 193 Ct.Cl. at 615, 435 F.2d 873. Moreover, the court is also mindful of the fact that a contractor is not charged with the technical intellect or grasp of a geologist or other

---

**35.** While on the other hand a "claim" letter dated January 4, 1984, by Mr. D.L. Johnson, vice-president of plaintiff, filed with the COE, averred that—"At the time of estimating this job, we reviewed the boring logs for evidence of rock...." PX 128. We observe, however, that Mr. Johnson failed to testify, and such failure was not explained; thus, no favorable inference

is warranted. *Goldberger Foods, Inc. v. United States*, 23 Cl.Ct. 295, 308 (1991).

**36.** The Court of Claims held in *United Contractors*, that "[b]orings are nevertheless considered the most reliable reflection of subsurface conditions." *United Contractors*, 177 Ct.Cl. at 164, 368 F.2d 585.

expert.[37] *Stock & Grove, Inc. v. United States*, 204 Ct.Cl. 103, 119, 493 F.2d 629 (1974). On the other hand, the court also notes that a contractor is deemed to be on notice of any subsurface conditions *indicated*, as here, within the boring logs of the contract documents, *Ragonese*, 128 Ct.Cl. at 159, 120 F.Supp. 768; and, to the extent that a contractor must interpret said logs, a contractor is to be held to the standard of a reasonably prudent contractor in deciphering the meaning of such logs. *Erickson–Shaver Contracting Corp. v. United States*, 9 Cl.Ct. 302, 305–06 (1985).

In the case at bar, we observe that the descriptive data portion of Boring # 23 is eminently clear in its indications that there were "some shale fragments" at depths of 0 to 2 feet below the surface, and again at 8 to 14 feet; also there was monterey shale at depths of 4 to 5 feet, and layers of monterey shale at 5 to 8 feet. Furthermore, Youngdale's expert witness, Mr. Sims, conceded when testifying that the government had indicated in Boring # 23 that there was rock present at the site, in that it identified the monterey shale in the boring log as rock.[38] Mr. Sims observed that where the government identified that there was monterey shale present, monterey shale was indeed present. Tr. 1332. Finally, when questioned by the court as to the propriety of calling shale "rock," Youngdale's expert testified that different geologists may use different descriptive definitions with respect to the same type of material. Tr. 1341.[39] We are constrained to conclude, therefore, that based even on the testimony of plaintiff's expert, the government properly utilized the USCS as its system of soils classification and correctly labeled the materials found at the site, despite Mr. Sims' contrary implication that said materials should have been labeled otherwise, *i.e.*, sandstone or conglomerate.[40] Moreover, the report of defendant's expert observes that " . . . the cemented material could arguably be called a sandstone or conglomerate." [41] DX 42.

This second element, we find, *cannot* be satisfied, by the requisite quantum of proof

---

**37.** The court in *Foster* also indicated that, given the time constraints of the bidding process, the bidder is not required to conduct geological or other technical investigations upon the site, particularly where the government has previously done so. *Foster*, 193 Ct.Cl. at 612–13, 435 F.2d 873.

**38.** Mr. Robinson, plaintiff's counsel herein, asked Mr. Sims if "there [were] any descriptions in those logs, which you as a geologist would conclude was rock?" Mr. Sims replied " . . . in one of the logs I reviewed, rock is identified." Mr. Robinson then asked " . . . and how is it identified," to which Mr. Sims replied, "it is identified as a layer of monterey shale." Tr. 1317–18.

Mr. Sims was then asked by the court to define monterey shale, to which Mr. Sims replied that monterey shale is "a sedimentary *rock* that is deposited in layers in deep sea environment. The formation is several thousand feet thick. It was deposited approximately five—between five and fifteen million years ago. It varies in hardness from chert to soft shale and usually occurs in layers of two to three inches each." Tr. 1318–19. Mr. Sims also provided the court with a sample of monterey shale taken in 1991 from a road cut approximately a quarter of a mile from the site. PXs 175–176, Tr. 1323. Mr. Sims indicated that he did not have any samples from his initial investigation of the site in 1983. Tr. 1322.

**39.** The court posed the following proposition: " . . . in one instance you may call a mass shale or rock and another equally qualified expert geologist may call it something else and at the same time accurately describe it"—to which the witness replied "that is correct." Tr. 1341.

**40.** Note that although defendant's expert witness, Mr. Ed Ketchum, did not testify at trial, his report was admitted as evidence, and when questioned about said report, plaintiff's expert, Mr. Sims, indicated that he could find no errors with the report but for the fact that Mr. Ketchum failed to identify the monterey shale *as such* in his report. Tr. 1351. However, Mr. Sims testified that different qualified geologists may classify the same material in different terms and still be correct. Tr. 1355.

**41.** With regard to the plaintiff's implied contention that it was misled by the government's "Final Geotechnical Report" dated July 26, 1982, the court notes that with respect to said exhibit, plaintiff did not receive said document until May 12, 1983, approximately five months after plaintiff had bid upon the project and had been awarded the contract. PX 3. Thus, it appears impossible, in the present light, that plaintiff could have been misled by any of the statements made in this document. Moreover, plaintiff failed to offer any probative evidence establishing that said document was part of *the* contract documents, or in any event, a part of any of the bid-related documents.

by plaintiff for the simple reason that the creditable evidence, *supra,* shows that it failed by its own negligence to review the boring logs (contract documents) *prior* to its bid. In an analogous issue in *C.W. Blakeslee & Sons, Inc. v. United States,* 89 Ct.Cl. 226, 246 (1939), the court stated:

> Plaintiffs knew this but made no effort to consult the log book, which was available to them. Plaintiffs therefore have no one but themselves to blame for the fact that at the time they submitted their bid they did not know that dynamite had been used by the defendant in making the borings and cannot be heard to complain that they were misled....

Since plaintiff negligently failed to review contract documents, *i.e.,* boring logs, prior to its bid, it necessarily follows that it could not have "acted as a reasonably prudent contractor in *interpreting*" same *at that time.*

### (iii) *Contractor Must Reasonably Rely On Subsurface Contract Indications*

It further follows with equal force, and we so find, that Youngdale cannot satisfy the third element of a Type I different site condition, *i.e.,* the contractor must have reasonably *relied* on the indications of the subsurface conditions in the contract, because again it failed to review the explicating boring logs.[42] In fact, the record is clear beyond doubt that had plaintiff reviewed the three logs prior to bidding, it would have been fully advised as to the monterey shale (*i.e.,* rock) and undoubtedly would have increased its bid appropriately.

Had that occurred, there of course would be no rock differing site condition issue.

### (iv) *Subsurface Conditions Encountered Must Materially Differ From Contract Indications*

Here, the irrefutable probative evidence establishes the contrary, *i.e.,* that the subsurface conditions actually encountered in the contract site area mirrored in all material particulars the subsurface contract indications in said area. Stated differently, the boring logs depicted proof by a preponderance of the evidence precisely a rock-like substance, which subsurface material was actually encountered. Therefore, we are compelled to find that plaintiff failed to establish the fourth element—that encountered materials differed substantially from contract indications.

### (v) *Encountered Subsurface Conditions Must Have Been Unforeseeable*

The fifth element requires a finding, given notice and availability of all contract documents, that subsurface conditions encountered must have been reasonably *unforeseeable.* According to the case law, the court looks generally to the information which the contractor possessed or was available to the contractor at the time of bidding in determining whether the encountered subsurface conditions were foreseeable. *See Stuyvesant Dredging,* 11 Cl.Ct. at 858; *Foster,* 193 Ct.Cl. at 614–15, 435 F.2d 873; and *United Contractors,* 177 Ct.Cl. at 168, 368 F.2d 585. Plaintiff also fails in its proof on this element simply because had it reviewed the operative logs, prior to bid, the encountered subsurface conditions would have been clearly foreseeable.[43]

---

**42.** At trial, Mr. Gaber testified that Mr. Youngdale had been in the business for over 25 years, perhaps 30 years. Tr. 76. Moreover, Mr. Gaber indicated that Youngdale bid on the average "a job a week as a norm." *Id.* at 77. In addition, Mr. Gaber indicated that Mr. David Johnson, then superintendent at the Vandenberg project and vice president of the company was an expert in the field of masonry. Tr. 75, 77–78, 81. Consequently, it is apparent to the court that J.R. Youngdale and his staff were experienced earthwork contractors.

**43.** The only outside evidence that plaintiff indicates may have "misled" it into believing that the encountered rock was reasonably unforesee-

able was the government's "Final Geological Report" dated July 26, 1982. Therein, the plaintiff contends that the government represents that the plaintiff need not consider the existence of rock as a subsurface condition, in light of the fact that the Guide Specifications of the report indicate that with regard to excavation for the buildings, utilities, and roadways, the contractor may *delete references to rock excavation.* The primary problem with plaintiff's analysis, however, is that it lacks proof upon which the court may find that plaintiff actually possessed such information *prior to or at the time of bidding.* According to our decision in *Weeks,* the plaintiff must possess information *at the time of bidding*

A related issue as to both elements 4 and 5 involves to the depths at which Youngdale actually encountered (shale) rock. Mr. Sims' expert report and his testimony at trial indicate that plaintiff encountered rock at about 5 feet in locations approximately where Borings # 23 and # 24 were taken.[44] Thus, according to the facts, Boring log # 23 accurately depicts the presence of (shale) rock at 4–5 feet, in that Mr. Sims found rock at that location at a depth of 5 feet. With regard to Boring log # 24, although said log does not specifically indicate that monterey shale was present at 5 feet, it does indicate that some sandstone[45] was found at depths of 5.5 feet to 11 feet.[46] Moreover, said log (# 24) shows, at 5.5 feet, blow counts of "59" which denotes "very dense" material; additionally, at about 6 feet there appears in the N-column the letter "A" which indicates "attempt." Thus, it appears clear to the court that based on Mr. Sims' testimony, Borings # 23 and # 24 accurately depicted the conditions encountered by Youngdale at the site and did not *materially* differ from the actual conditions encountered. Moreover, when asked by plaintiff's counsel as to whether the other logs (logs # 24 and # 25) depicted that there was rock at the site, Mr. Sims limited his response to the "written portion of the log."[47] That is to say, despite the fact that Mr. Sims conceded later in his testimony that different geologists may use different descriptive terms to classify the same material, he did not deny the fact

that the standard penetrometer data contained in the borings may have clearly depicted the conditions at the site, even if the descriptive data was not as accurate.[48] In fact, Mr. Sims testified that if one ignores the descriptive data, and relies solely on the standard penetration test results, "the only assumption I [Mr. Sims] could make is that you [the contractor] encountered a very hard material." Tr. 1356.

In addition to Mr. Sims' testimony, the court finds that both Mr. Gaber and Mr. Manka testified as to the presence of rock at the site. Tr. 171–173, 330–331. However, only Mr. Gaber provided the court with any indications as to what depths Youngdale encountered the rock. According to Mr. Gaber, Youngdale encountered rock "at probably 18 [inches] to 2 feet below the surface" while it was excavating for the utility lines near the buildings. Tr. 171–172. As to which building, in particular, Mr. Gaber was referencing, the record is unclear, inasmuch as Mr. Gaber failed to precisely indicate exactly where he and other Youngdale employees encountered the rock. In this connection, however, the court was able to utilize PX 168, *i.e.*, a color-coded map drawing indicating where the site utilities were placed in relation to the referenced buildings. The map also indicated with some degree of specificity where Youngdale encountered the hard rock. Thus, from the diagram of the construction site as situated on PX 168, the

---

which would make it reasonably foreseeable or unforeseeable that a certain condition may occur. *Id.* at 236. Based on the facts herein, plaintiff did not receive the government's "Final Geological Report" until May 12, 1983, a time significantly after the plaintiff had bid (January 26, 1983) on the project, as well as had been awarded the contract. Moreover, even if the plaintiff had been in possession of said document prior to or contemporaneously with the bidding process, we have previously concluded that, based on the contract documents contained herein, the actual subsurface conditions encountered by Youngdale would have been foreseeable had it timely and properly interpreted the boring logs with respect to the rock condition.

**44.** Specifically, Mr. Sims testified: "One of our excavations was done in the area of the log that showed monterey shale and we encountered

monterey shale.... The other excavation was done in the area where no shale was shown, but we encountered monterey shale at a depth of five feet." Tr. 1336–37.

**45.** Note that plaintiff's expert identified the rock found at the site near Boring # 23 as sandstone. PX 119.

**46.** This difference of .5 feet is not legally significant and does not rise to the level of a *material* difference as required by the differing site conditions clause. *See Servidone*, 19 Cl.Ct. at 356.

**47.** Mr. Sims testified that—"[t]he other logs that I observed did not describe *in the written portion* of the log any presence of rock." Tr. 1334.

**48.** Recall that refusal occurred on no less than six separate occasions with respect to the three relevant borings. DX 42.

court was able to determine that the hard rock was found predominately near Building "A." This being true, the court's next step was to determine what borings were within the site area of Building "A." To accomplish this task, the court looked to DX 42, wherein there is a map entitled V.O.Q. Project Layout which depicts where Borings # 23, # 24, and # 25 were taken in relation to the buildings and other areas at the site. From this map, which is attached hereto as Appendix–A, the court was able to determine that Boring # 23 was located within the proximity of Building "A," whereas Borings # 24 and # 25 were closer to Building "C." Therefore, by superimposing DX 42 map over PX 168 map, the court was able to determine with respect to Building "A" that Boring # 23 would contain the requisite descriptive subsurface data needed to determine the condition of the ground within that area. Borings # 24 and # 25 were more indicative of the subsurface area near Building "C."

After completing the aforementioned analysis, the court then returned to the descriptive portion of Boring # 23 which indicates that, between 0 feet and 2 feet, there are *"some shale fragments"*; and between 4 feet to 5 feet, *"highly weathered monterey shale"* is present; and *"layers of monterey shale"* appear between 5 feet to 8 feet. With regard to the blow counts, the court also finds that *refusal* occurred as early as 2.5 feet and again at approximately 11 feet below the surface. Taking all these factors into account, it is patently clear, and we so find, that with respect to the area next to and within the reasonable proximity of Boring # 23, monterey shale (*rock*) was in fact present. This being true, then it is also crystal clear that Youngdale should have, and would have, anticipated that it was likely to encounter rock near Building "A" had it reviewed the boring logs, given that Boring log # 23 is a reasonably accurate

indicator of the subsurface conditions in that area. All of the foregoing we find as fact. Not only does Boring # 23 indicate that there is rock present with respect to Building "A," but also that Youngdale actually encountered such (shale) rock in areas and depths reasonably proximate, in depth, as depicted in the boring log(s) when excavating for its utilities for Building "A." Thus, we hold that the actual conditions encountered at the site did not *materially* differ, as to depth, from those depicted in the contract documents. *See Arundel,* 515 F.2d 1116. Plaintiff, therefore, has also failed to establish a different site condition relating to the situs or location of depicted subsurface material.

Finally, since plaintiff has failed to establish a materially-different site condition with respect to rock, *supra,* the conclusion is inescapable that it cannot establish the sixth element, *i.e.,* that its excess cost stems solely from the materially-different subsurface condition.

### (b) TYPE II—DIFFERING SITE CONDITION

Previously, we observed that plaintiff's claim with respect to the rock encounter averred both a Type I and a Type II differing site condition. In light of the court's ruling that plaintiff failed to carry its burden with respect to a Type I differing site condition, we now address plaintiff's contention that the encountered rock when compared with contract indications constitutes a Type II differing site condition.

Our reading of the relevant and binding case law leads us to conclude that, in order for the plaintiff to prove a Type II differing site condition, a combination of two of three indispensable elements must be established, namely, that (i) the physical condition at the site was unknown; or (ii) said condition was unusual and could not be reasonably anticipated by the contractor from his study of the *contract documents,*[49] his inspection of the site, and his

**49.** Plaintiff cites specifically to *Perini Corp. v. United States,* 180 Ct.Cl. 768, 780, 381 F.2d 403, 410 (1967), and the language therein in its post-trial submissions; however, it conveniently left out that portion of the court's standard which indicates that the condition must not be antici-

pated by the contractor *from his study of the contract documents.* Specifically, plaintiff states in its brief:

"A Type II claim requires plaintiff to show three elements. First, plaintiff must show that it did not know about the physical condi-

general experience, if any, in the contract area; and (iii) the condition encountered was materially different from those ordinarily encountered and generally recognized as inhering in the work of this character. *Servidone,* 19 Cl.Ct. at 360; *Perini,* 180 Ct.Cl. at 780, 381 F.2d 403. *See generally Loftis,* 110 Ct.Cl. at 618, 76 F.Supp. 816; *Lathan Company, Inc. v. United States,* 20 Cl.Ct. 122 (1990); *S.T.G. Construction Co. v. United States,* 157 Ct.Cl. 409, 415 (1962). In other words, to prevail on this issue, plaintiff *must* prove, by a preponderance of the evidence, either elements # 1 and # 3 or elements # 2 and # 3.

In reviewing the record with respect to the Type II claim, the court finds that not only does the defendant fail to even address the claim, but also the plaintiff merely addresses the claim in a highly conclusory argumentative manner. That is to say, plaintiff points to no probative evidence in the record, and we find none, purporting to prove, by a preponderance of the evidence, the foregoing elements that must be established. For example, in its brief of December 10, 1991, plaintiff discusses (at p. 51) this issue on all of one page and merely hospitably concludes that:

> It did not know of the subsurface rock. Youngdale could not have anticipated the condition from looking at the site—it was slightly rolling and no rock was evident. It is not normal to encounter pervasive cementitious rock at depths of 1 to 4 feet in contracting work.

While defendant proffers no argument or proof respecting the existence of a Type II different site condition respecting the rock, this circumstance gives plaintiff no comfort inasmuch as the threshold burden of proof is on plaintiff respecting this issue.[50] Given this record, apparently neither party is of the position that the facts herein will

support a finding that the rock constituted a Type II differing site condition, and we agree, as discussed, *infra.*

Turning to the first element, *i.e.,* the physical condition at the site was unknown prior to the bid, has not been and cannot be proven by a preponderance of the evidence. This is true for the reason that we find that the boring logs were part of the contract documents and were available to plaintiff prior to the bid. We have further found that the proof shows that notwithstanding the foregoing, plaintiff, for whatever reason, failed to review such logs prior to bidding. The record further shows, and we so find, that had plaintiff reviewed such logs, prior to bidding, it would have then known that monterey shale, a hard, a/k/a rock-like, substance, was found at varying depths by the borings. On these creditable and indisputable facts, we are constrained to impute actual knowledge of the subsurface condition at the site. It is settled that "a contractor who knows or should have known the facts of the conditions at the site is estopped." *Vann v. United States,* 190 Ct.Cl. 546, 420 F.2d 968, 982 (1970); *see also C.W. Blakeslee,* 89 Ct.Cl. 226. Coupled with the foregoing, and the overall general contracting experience of Youngdale, *supra,* we find that plaintiff, as a reasonable and prudent contractor, did in fact know, or should have known, of the actual subsurface condition at the construction site prior to its bid.

With respect to the second element, there is no probative evidence in the record warranting a finding that the encountered subsurface condition was in fact unusual in any respects and could not reasonably have been anticipated given available data and experience. Thus, we find that proof is wanting respecting the second element.[51]

---

> tion. Second, plaintiff must show that it could not have anticipated the condition from inspection or general experience. Third, plaintiff must show that the condition varied from the norm in similar contracting work...."

(further citations omitted).

**50.** The court observes, however, that the burden of proof rests upon the plaintiff and does not shift until the plaintiff has established a *prima*

*facie* case by a preponderance of the evidence. *Hendricks v. United States,* 14 Cl.Ct. 143, 148 (1987); *Smith v. United States,* 557 F.Supp. 42, 51 (W.D.Ark.1982); *Thinguldstad v. United States,* 343 F.Supp. 551, 556 (S.D.Ohio 1972).

**51.** Note that according to the testimony at trial, the plaintiff never visited the site prior to bidding on the contract.

Finally, the third element requires that the encountered condition must differ materially from that of similar conditions normally encountered by contractors performing similar contracting work. With respect to this element, plaintiff offered not one scintilla of proof at trial that the alleged rock condition encountered at the site in any way differed, let alone differed *materially*, from those conditions ordinarily encountered and generally recognized as inherent in the type of excavation work performed by Youngdale. Therefore, plaintiff fails in proof of its burden on this issue as well.

In summary, therefore, we are constrained to conclude that, based on the criteria required to be applied in determining the existence of a Type II differing site condition, the facts of this case as established by the plaintiff do not prove by a preponderance of the evidence that the rock condition was unknown at the time of the bid, unusual to the extent unforeseeable, nor do they show how this condition differs materially from any other conditions normally encountered in similar contractual work. *See Servidone,* 19 Cl.Ct. at 360–377. The plaintiff, therefore, has failed to establish a Type II differing site condition with respect to the rock encountered.[52]

## B. DAMAGES

Having determined that plaintiff has failed to prove both a Type I and Type II

---

**52.** In its *post-trial* submissions, the plaintiff briefly addressed the following four claims initially raised in its pretrial submission(s) filed on July 16, 1990: (i) Failure to Disclose Vital Information, a breach of contract claim; (ii) Contract Interpretation During Performance; (iii) Interference and Failure to Cooperate; and (iv) Acceleration (the latter three constructive change claims). With respect to the aforementioned claims, the court observes that the plaintiff failed to file a CDA claim with the CO as to each of the four claims. Consequently, this court does not have jurisdiction to hear any of the four claims in light of the Claims Court's holding in *SMS Data Products Group, Inc. v. United States,* 19 Cl.Ct. 612 (1990).

In *SMS Data,* Judge Rader held, and we agree, that "[p]laintiff may not seek damages for a *new* claim—a claim not yet submitted to and decided by the contracting officer." *Id.* at 615. In support of said well-established premise, Judge Rader cited to *LDG Timber Enterprises, Inc. v. United States,* 8 Cl.Ct. 445, 455 (1985), wherein the court stated:

[The claim before the Claims Court] is not merely an aspect of a claim which has already been presented to the CO and on which the CO has deliberated. Rather, it raises new matters which must, in the first instance, be presented to the CO for his consideration (including the possibilities of settlement). Since plaintiff failed to present this claim to the CO, this court is without jurisdiction to hear the matter.

(citations omitted). According to the record herein, plaintiff's only claim before the CO is that of direct and indirect damages stemming from its differing site conditions claims. Nowhere does it mention, prior to its pretrial submissions, the four previously-referenced claims in any of its multiple-filed claims with the CO, *supra.* Moreover, each of the four claims are based on separate and distinct new theories of

law, *i.e.,* the Failure to Disclose Vital Information claim is a *breach of contract* claim which requires, *inter alia,* that the plaintiff prove, by a preponderance of the evidence, that the defendant had *knowledge* of the existence of the excess water condition prior to submitting the contract specifications, *Servidone,* 19 Cl.Ct. at 375; (ii) the Contract Interpretation During Performance claim is a *constructive change* claim which requires the plaintiff to prove "as a result of the Government's misinterpretation of [the] contract provision[s] the contractor ... [was] required to perform more or different work, or to higher standards, not called for under ... [the contract] terms." Cibinic & Nash, *Administration of Government Contracts,* at 325 (quoting *Emerson–Sack–Warner Corp.,* ASBCA No. 6004, 61–2 BCA ¶ 3248, at 16,827, 1961 WL 602 (1961); (iii) the Interference and Failure to Cooperate claim is also a *constructive changes* claim whereby the plaintiff must prove that the government's actions or inactions, *i.e.,* the breach of its duty to cooperate with the contractor or not hinder or interfere with his contract performance, caused the plaintiff to suffer damages. Note that this claim is generally filed as an *alternate* theory of recovery where a contractor has been unable to recover under the contract itself. *See* Cibinic & Nash, at 352–57; and finally, (iv) the Acceleration claim is again a constructive changes claim which requires the plaintiff to prove, *inter alia,* that the contracting officer had knowledge of an excusable delay at the time it made some statement or act which could be construed as an acceleration order. *Id.* at 340.

In addition to the foregoing, even if the four putative claims had been submitted to the CO, said claims lack quantification and, therefore, are not proper claims under the CDA. *Contract Cleaning,* 811 F.2d at 592; *Metric Construction Co., Inc. v. United States,* 1 Cl.Ct. 383, 391 (1983).

rock differing site condition, but has established, by a preponderance of the evidence, the existence of a water differing site condition, we now turn to the appropriate theory or methodology in calculating such damages. To the extent that the plaintiff has not specifically bifurcated the proof of its damages entitlement, with respect to the water and the rock, said damages shall be disallowed, pursuant to *Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed. Cir.1984).[53]

We now turn to the issue—what method of recovery is the plaintiff entitled to utilize in calculating its damages in light of the facts and circumstances herein. According to the defendant on this record, plaintiff is entitled to use only the *actual* cost method of recovery; whereas, the plaintiff contends that it is entitled to use the *total* cost method. For the reasons discussed hereinafter, we disagree with the plaintiff, in that we deem that the appropriate method to calculate damages herein is the *direct* (actual) cost method.

### 1. The Total Cost Method and the Modified Total Cost Method

■ Prior to and at the trial, plaintiff strenuously averred that the sole method of calculating its damages was the total cost method. The defendant, on the other hand, avers that not only is the plaintiff not entitled to utilize the total cost method of recovery, but also this court has no jurisdiction to hear said methodological claim because "Youngdale never submitted its total cost claim [theory] to the contracting officer." On this issue, we disagree with the defendant's contentions, in that, in *J.F. Shea Co., Inc. v. United States*, 4 Cl.Ct. 46, 54–55 (1983), the Claims Court held that

jurisdiction over a claim for damages in excess of the claim submitted to the CO is proper where the "factual basis of the claim before this court is identical to the claim which was certified to the contracting officer." *Id.* at 55. Thus, the contractor is not precluded from modifying the amount of the claim or from proffering additional evidence in support of increased damages where the increased amount thereof does not constitute a *new* claim which was not previously submitted to the CO for decision. *Id.* at 54–55. Moreover, the court points out that "it would be most disruptive of normal litigation procedure if any increase in the amount of a claim based upon matters developed in litigation before the court had to be submitted to the contracting officer before the court could continue to a final resolution on the claim." *Id.* at 54.[54] The primary reason for the certification process is to ensure that the plaintiff is submitting a claim in an amount that he *then* believes is due, and that the data furnished at that time is accurate and complete to the best of his knowledge and belief. *Id.; cf. Continental Drilling–U.S.*, AGBCA No. 81–182–1, 82–1 BCA ¶ 15,545 at 77,068, 1982 WL 7003 (1982). Thus, to the extent that any portion of plaintiff's total cost claim is deemed to be appropriate herein, the court has jurisdiction to hear said claim.[55] Accordingly, we shall address the total cost method in addition to the various other methods of recovery espoused by the plaintiff in its post-trial submissions, to the extent that they bear any relevance to the evidence in this case.

The total cost method of proving damages has been approved by the Federal Circuit as a theory of last resort. *Servidone*, 931 F.2d at 861. We understand this

---

**53.** "The general rule is that '[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party.' [citations omitted] Courts will deny recovery where the delays are concurrent and the contractor has not established its delay apart from that attributable to the government." 731 F.2d at 809.

**54.** In *Concrete Placing Co. v. United States*, 25 Cl.Ct. 369, 377 (1992), the court noted that the plaintiff set forth its total cost claim initially at

trial. The court then concluded that the plaintiff had satisfied the necessary criteria, and awarded plaintiff damages pursuant to the total cost method accordingly.

**55.** Similarly, the court has jurisdiction to hear plaintiff's other claim theories with respect to the computation of damages, *i.e.*, the modified total cost method, the productivity comparison method, the estimated evaluation method, the jury verdict method, and the cost plus method.

to mean that the Federal Circuit has condoned the use of said method only "in those extraordinary circumstances where no other way to compute damages was feasible and where the trial court employed proper safeguards." *Id.* at 862. In essence, the amount of damages recoverable under the total cost method is roughly equivalent to the total actual costs incurred in performing the contract minus the contractor's bid price or estimated costs. Use of this method is highly disfavored by the courts, because it blandly *assumes*—that every penny of the plaintiff's costs are *prima facie* reasonable, that the bid was accurately and reasonably computed, and that the plaintiff is not responsible for any increases in cost. *Urban Plumbing & Heating v. United States,* 187 Ct.Cl. 15, 408 F.2d 382 (1969); *F.H. McGraw & Co. v. United States,* 131 Ct.Cl. 501, 130 F.Supp. 394 (1955). These assumptions will not fly because relevant case law has shown that this method is used only in cases where no other means of accurately computing damages are available. *J.D. Hedin v. United States,* 171 Ct.Cl. 70, 347 F.2d 235 (1965); *G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662, 676 (1984); *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 193, 351 F.2d 956 (1965). That is to say, the total cost method is only utilized in extreme cases where it is difficult or impossible to identify specific increases in costs with the actions of the defendant. *Phillips Construction Co. v. United States,* 184 Ct.Cl. 249, 394 F.2d 834 (1968).

■ In light of these constrictions, the courts, as a safeguard against the utilization of the total cost method, have developed a set of criteria which the plaintiff *must* establish in order to secure a recovery of damages under this approach. In short, the acceptability of said methodology hinges on plaintiff's proof of—(i) the impracticability of proving actual losses directly; (ii) the reasonableness of its bid; (iii) the reasonableness of its actual costs; and (iv) the lack of responsibility for the added costs. *Servidone,* 931 F.2d at 861; *Boyajian v. United States,* 191 Ct.Cl. 233, 246–254, 423 F.2d 1231 (1970); *WRB Corporation v. United States,* 183 Ct.Cl. 409,

426 (1968). In general, the Claims Court has not only strictly adhered to this four-part conjunctive test, but it has also held that the plaintiff has the burden of proving its damages by a preponderance of the evidence. *Teledyne McCormick–Selph v. United States,* 218 Ct.Cl. 513, 517, 588 F.2d 808 (1978). Thus, if plaintiff cannot prove all of the elements, or if the defendant can disprove at least one of them, the court will deny total cost recovery. *See Servidone,* 931 F.2d at 862. Such a circumstance, however, is not fatal to a recovery of damages inasmuch as it may give rise to the court's use of an alternative, *i.e.,* the modified total cost method. *Id.*

■ The modified total cost method is simply *the* total cost method *modified* or adjusted for any deficiencies in the plaintiff's proof in satisfying the four requirements of said method. *See Servidone,* 931 F.2d at 861. In other words, to the extent that the court *modifies* any of the four-prongs of the total cost test, the court has, in actuality, utilized the modified total cost method as opposed to the total cost method. *Id.* The theory behind the modified approach is that, in order to prevent the government from obtaining a windfall stemming from the plaintiff's inability to satisfy all of the elements of the total cost method, the court will modify that test, so that the amount that would have been received by the plaintiff under the total cost method, is only the starting point from which the court will adjust the plaintiff's recovery downward to reflect the inability to prove any of the aforementioned four elements. *Id.* at 862. *See Boyajian,* 191 Ct.Cl. at 247–48, 423 F.2d 1231; *MacDougald Constr. Co. v. United States,* 122 Ct. Cl. 210 (1952). Against this background, we shall now address, seriatim, each of the requisite four elements to the recovery of damages under the total cost method, and, if appropriate, the *modified* total cost method as well.

### (a) *The Impracticability Of Proving Actual Losses Directly*

To prove this element, it must be appropriately established that the nature of

plaintiff's losses makes it highly impracticable to determine the amount of the *actual* losses with a reasonable degree of accuracy. *Servidone*, 931 F.2d at 861. On this record, we are satisfied, for several reasons, that the plaintiff has failed to meet its burden with respect to this prong of the test, in that:

(1) plaintiff knew as early as the pre-construction conference that it had discovered a water differing site condition;

(2) from that point in time, it memorialized by letter/memorandum to defendant each adverse circumstance stemming from the excess water that adversely affected its costs;

(3) these historical facts are contained in 457 daily reports and approximately 26 letters to the Corps from plaintiff;

(4) at all times pertinent herein, plaintiff had at its disposal, in evaluating additional costs, its bid estimate containing the costs of detailed items; [56]

(5) plaintiff was an experienced construction contractor having performed in this business for approximately 25 years;

(6) plaintiff failed to introduce its books and records, although admittedly in the courtroom and established through its accountant, that not only could it not maintain reasonably accurate records of its *additional costs* attributable to the excess water, but also that it did not in fact maintain such records; and

(7) since a plausible explanation was not proffered for such failure, we believe an adverse inference is warranted, *i.e.*, the books might in fact show additional costs from the excess water to be a fraction of the amount claimed.

Certainly, it is clear beyond cavil that by 1983 cost accounting had sufficiently advanced to the point where, consistent with Generally Accepted Accounting Practices (GAAP), plaintiff's additional and unanticipated costs stemming from the excess water condition could have been separated out from the original cost estimate with reasonable accuracy. In such circumstance, preci-

sion is not required—where a reasonable approximation is credible. Here, plaintiff failed on both counts. Consequently, we find that plaintiff has failed to satisfy prong one of this four-part test. Since the elements are in the conjunctive and plaintiff has failed to meet the first one, our analysis, as to its entitlement to utilize the total cost method in determining damages, could, of course, end here. Nevertheless, and because of plaintiff's strong belief in its entitlement, we shall briefly discuss each element in turn.

(b) *The Reasonableness Of The Bid*

According to the Federal Circuit and the Claims Court, this element requires that the plaintiff prove that its bid was reasonable as made. *Servidone*, 19 Cl.Ct. at 384, 931 F.2d at 862. With respect to this element, the *Servidone* court points out that the justification behind the reasonable bid requirement is that, although entitled to recovery under the total cost method, the plaintiff should not "get the benefit of its own failure to anticipate that level of difficulty that a reasonable contractor should have expected." *Servidone*, 19 Cl.Ct. at 384–85. In other words, the plaintiff should not get the benefit of increased damages merely because it submitted an unreasonably low bid, thereby increasing the difference between its bid and its actual costs solely by underbidding the project and not by incurring incremental costs caused by the defendant's reprehensible actions. *Servidone*, 931 F.2d at 861–62. In this connection, *Servidone*, 19 Cl.Ct. at 385, observes that ". . . a determination of what was a reasonable bid must be made from the bids of others."

In reviewing the facts in this case, this court is of the opinion, as in *Servidone*, that we cannot utilize the plaintiff's bid in calculating the appropriate amount of damages under the total cost method because said bid is, on this record, unreasonable. This is true, despite Mr. Gaber's testimony regarding Youngdale's detailed bid preparation methods. In reviewing said testimony, it is clear to the court that Mr. Gaber

---

**56.** Often plaintiff's equipment sank so deep into the mud that even a large tractor would be almost completely immersed in the soil. Tr. 146–156.

had no specific knowledge as to how the individual estimates of the Vandenberg bid were developed. Tr. 196. In fact, he specifically testified that the estimating department of Youngdale prepared the bid estimates, and he merely reviewed them with Mr. Johnson, the superintendent of the project, only to see if anything was out of line. Tr. 76, 81–85. Moreover, when questioned by the court on direct as to whether he specifically took part in preparing subject bid, Mr. Gaber responded in the negative, and when asked again on cross, he indicated that he didn't know. Tr. 116, 196–97. While it appears that Mr. Gaber may be generally familiar with Youngdale's bidding processes, the record does not support a finding that he actively participated in the *preparation* of that bid and was able to identify what *actually* took place in the preparation thereof. In addition, the only documentary evidence submitted by the plaintiff to prove that its bid was reasonable is PX 6, a one-page master summary bid sheet, which, according to Mr. Gaber's testimony, is missing other supporting detail sheets that were utilized at the time the bid was actually prepared. Tr. 100–102. Moreover, upon reviewing the other 11 contractors' bids, in addition to the government's bid, the court was able to determine that Youngdale's bid was approximately 17% lower than the average of the 12 [57] other bids.[58] Thus, given these facts, as well as the following factors: (1) Youngdale failed to prove with any degree of specificity how it calculated its bid estimates; (2) Youngdale misinterpreted the contract documents with respect to the rock condition and negligently failed to include in its bid reasonable costs associated with excavating for that rock; and (3) Youngdale failed to conduct a site investigation before bidding on the project, it is obvious to the court that the record reasonably supports an inference that Youngdale underbid the project.

Rather than attempt to speculate as to the *full* impact of Youngdale's underbid, we conclude, in accordance with our predecessor court in *Great Lakes Dredge & Rock Co. v. United States*, 119 Ct.Cl. 504, 96 F.Supp. 923, 926 (1951), and because there is no other testimony in the record as to what would have been a reasonable bid, that an average of the government's estimate and the 11 other bids would be the appropriate method for calculating the fairest basis by which to compare the reasonableness of plaintiff's increased costs (bid). *Id.* Thus, under the facts herein, we find that a reasonable bid estimate for Youngdale would have been $3,235,080.00,[59] including profit. Additionally, because the court has modified plaintiff's bid so as to satisfy element 2 of the total cost method test, the court hereby finds that the plaintiff has failed to prove its damages claim under the total cost method by a preponderance of the evidence, and is hereby relegated, if appropriate, to use of the modified total cost method as proof of its damages. *See Teledyne*, 218 Ct.Cl. at 517, 588 F.2d 808; *Servidone*, 931 F.2d at 861. Notwithstanding the availability of the modified total cost method, the court must still address the final two elements of the total cost method, since the elements of these two methods are one and the same. *Servidone*, 931 F.2d at 861.

*(c) The Reasonableness of Actual Costs*

The third element of the "modified" total cost method is whether plaintiff's actual costs are reasonable. *Id.* In this connection, the court looked at the documentary evidence submitted by both parties and scoured the testimony of the witnesses tes-

---

**57.** The 12 bids are made up of 11 other contractor bids (*see* note 4) and the government's bid of $3,030,000.

**58.** In addition to Mr. Gaber's testimony, Mr. Guy Brinegar, another bidder on the Vandenberg project, testified in a conclusory manner as to the reasonableness of Youngdale's bid. Tr. 524–25. In this connection, however, the court observed that a majority of Mr. Brinegar's testimony related to how he prepared his own bid,

which, according to the facts herein, was over $675,000 more than Youngdale's bid. Tr. 521–38. The only specific knowledge Mr. Brinegar had of Youngdale's bid was obtained from a 45–minute conversation that he had with Mr. Youngdale *after* the bid opening. Tr. 534.

**59.** This average is arrived at by aggregating the bids of the 11 other contractors plus the government's estimate and dividing by 12 ($38,820,958 ÷ 12 = $3,235,080).

tifying as to plaintiff's cost data. In so doing, we note that the evidence which the plaintiff adduced to prove its *actual* costs is—(1) PX 162, a two-page Job Cost sheet dated January 4, 1985, prepared by Youngdale's in-house accounting staff, Tr. 568; (2) PX 169, a one-page bid-cost comparison sheet, prepared by Ms. Finch, Tr. 587; (3) PX 170, a one-page calculation of damages determining Youngdale's equitable adjustment under the total cost method, prepared by Ms. Finch, Tr. 609; and (4) the testimony of Ms. Lisa Finch, an accountant. Tr. 566–740. First, with respect to the Job Cost sheet, the totals thereon conclude that Youngdale spent $3,732,786.31 on the Vandenberg project, excluding overhead. PX 162. The information on said two-page job cost sheet, however, specifically shows detailed costs for only $1,054,863.99. *Id.* In short, there is no indication on either of the two pages of the job cost sheet as to what actual specific costs are included in the remaining $2,677,922.32. In fact, the only reference to said amount is a handwritten notation that indicates that $2,677,922.32 was merely added to $1,054,863.99 to aggregate the $3,732,786.31 total. There is no proof, therefore, as to where the $2,677,922.32 originated from, what it entails, or who even wrote the amount on the exhibit. While plaintiff admitted that its books and records were in the courtroom (Tr. 740), it neglected to explain its failure to offer same into evidence to corroborate said costs. Again, since plaintiff failed in this regard, we are compelled to draw an adverse inference with respect to PX 162 in proof of the $3,732,786.31 in costs. *Hoffman v. Commissioner*, 298 F.2d 784, 788 (3d Cir.1962). This is appropriate because, based on PX 162, the court is at a loss as to what detailed costs are contained in the $3,732,786.31. The court, therefore, went on to consider the other relevant evidence in addition to Ms. Finch's testimony as to the alleged costs herein. In so doing, the court sought to determine whether Ms. Finch's testimony corroborated the aforementioned costs and related them back to

its source documents, thereby allowing the court to comfortably rely upon said costs, despite the fact that plaintiff failed to adduce its original source documents. Also, we proceed in this manner in light of our predecessor court's holding that—"[a] schedule of verified costs ... is not proof of damages but only a starting point." *Boyajian*, 191 Ct.Cl. at 247, 423 F.2d at 1239. The Court of Claims also held that "[plaintiff's costs] appear[ing] on plaintiff's damage schedule does not by itself amount to probative evidence in the absence of anything else...." *Id.* (quoting *Roberts v. United States*, 174 Ct.Cl. 940, 949, 357 F.2d 938 (1966)).[60]

In reviewing Ms. Finch's testimony and the documents she admittedly prepared, PXs 169 and 170, the court gets no comfort as to the probative value of the job sheet (PX 162) inasmuch as PXs 169 and 170 are merely a regurgitation of PX 162. Tr. 566–740. To this extent, and on the whole, Ms. Finch's testimony was neither credible nor probative as to PX 162. When questioned by the court as to exactly what she did to verify PX 162, Ms. Finch testified that she merely reviewed the numbers, *i.e.*, refooted the exhibit to ensure that the totals were correct. *Id.* She also stated that she looked at the computerized general ledger reports to verify the amounts on the exhibit. However, when asked if she verified all the figures or at least a majority of them, she testified that she only looked at two of the 29 accounts and that she did not review any supporting documentation with respect to any of the alleged costs. Tr. 579 and 650. It is obvious to the court, against this record, that a mere sampling of less than 10% of plaintiff's alleged costs is clearly inappropriate given the magnitude of plaintiff's contentions with respect to its damage claims. Moreover, when the defendant questioned Ms. Finch as to whether she was aware of how this particular job cost sheet was prepared, her testimony indicated that she was unaware of any specifics with respect to the preparation of PX 162, and that she was also unaware of even who

---

**60.** Recently, the Claims Court has indicated that "[j]ust because plaintiff has submitted an actual cost figure ... does not necessarily compel the conclusion that this figure is the most accurate reflection of the damages plaintiff incurred." *Concrete Placing*, 25 Cl.Ct. at 378.

in fact prepared said document in 1985 beyond that of "Mr. Youngdale's in-house accounting staff." Tr. 568–70, 572–77. In fact, she admittedly never even saw PX 162 until sometime in 1991.[61] Tr. 577.

The probative value of Ms. Finch's analysis of plaintiff's job costs is marginal at best, in light of her inexperience in government contract costing, particularly as to what costs are allowable or unallowable pursuant to the regulations. Tr. 649–60.[62] Consequently, we are constrained to conclude that Ms. Finch's testimony is not credible with respect to the efficacy of the figures on plaintiff's job cost sheet, PX 162. Moreover, we cannot give much, if any, credence to PXs 169 and 170,[63] which were prepared by Ms. Finch as proof that Youngdale is entitled to an equitable adjustment under the total cost method, because *both* exhibits are derived from the unsubstantiated job cost sheet, *i.e.*, PX 162, and the bid master sheet, *i.e.*, PX 6, which were determined by this court to be unreasonable, *supra.*

Therefore, given, but not limited to, the marginal probative value of Ms. Finch's testimony, the dearth of evidence proffered by the plaintiff with respect to its actual costs, and the plaintiff's failure to introduce its books and records, the court is of the opinion that the plaintiff has also failed to meet the third element of the total cost method, *i.e.*, reasonable actual costs.[64] In this instance, the court is unable to modify this prong of the test, as plaintiff has failed to give the court even one scintilla of probative evidence upon which we can reasonably rely in determining plaintiff's actual costs, let alone determine that said costs were reasonable.

As a consequence, we hereby hold that not only has the plaintiff failed to prove its damages by a preponderance of the evidence as to the total cost method, but it has also failed to do so as to the modified total cost method. More significantly, the court is of the opinion that due to plaintiff's lack of probative evidence as to any of its excess costs, save one significant exception, we would be clearly justified in disallowing all of plaintiff's damages claims irrespective of the method otherwise utilized in the instant case. However, the court believes that it would be a great injustice to deny all damages due to plaintiff's failure of affirmative proof, where it is clearly evident that plaintiff incurred substantial additional costs due to the excess water condition.

**61.** The court observes that Ms. Finch testified that the job cost sheet was audited by "an accounting firm named John Pought from Portland, Oregon. And he prepared the audited financial statements for the fiscal year ending March 31, 1985, in which this job was completed" (Tr. 583); however, the plaintiff failed to call anyone from said firm to testify as to the accuracy of any of the audited figures.

**62.** Plaintiff's counsel failed to establish Ms. Finch's educational or professional background beyond the fact that she is presently employed as a manager at Kuhn and Thefeld, a certified public accounting firm. Tr. 568.

**63.** PX 169 is a one-page summary sheet which compares the bid estimates for a particular item, *i.e.*, labor, to the actual costs incurred with respect to that item, and then calculates Youngdale's excess costs therefrom, *i.e.*, the extent to which the actual costs exceed the bid estimates.

PX 170 is a one-page summary schedule depicting Youngdale's equitable adjustment as determined under the total cost method, *i.e.*, it begins with Youngdale's alleged total costs of $3,732,786** and adds to that $46,500*** in alleged "wrongfully" withheld liquidated damages, $25,000*** for the Garcia Paving settlement claim allegedly paid by Youngdale, overhead of $189,750,** and a 10% profit of $399,-403, for a grand total of costs, overhead, and profit of $4,393,440. The schedule then deducts from that figure Youngdale's bid of $2,693,800, for an equitable adjustment of $1,699,640.
** Note that plaintiff has not offered any credible proof with respect to substantiating the amount of this item.
*** This amount is in error, as the liquidated damages withheld from Youngdale by the government totalled $46,750, not $46,500. DX 44.

**64.** According to the court in *Servidone*, the plaintiff therein was allowed to recover under the total cost method, because the court was able to rely upon the accountant's testimony with respect to the costs claimed, *i.e.*, the court was generally impressed with the accountant's considerable experience in auditing construction companies, and his knowledge and competency as a witness. *Servidone*, 19 Cl.Ct. at 384. Additionally, the court indicated that the accountant "completely reconstructed plaintiff's accounting records by going back to original documents." *Id.* Clearly, this is not the case at bar.

*See Luria Bros. & Co. v. United States,* 177 Ct.Cl. 676, 696, 369 F.2d 701 (1967). Fortunately for the plaintiff, however, defendant, in its post-trial memorandum, has judicially conceded not only liability but also to the fact that Youngdale is entitled to *at least $210,433.* DML, p. 19. That is to say, the government is of the position that Youngdale is only entitled to damages indicated by those direct costs as to which its government auditor was able to verify in its audit report. DX 50. We agree, but only to the extent that the court is able to rely upon said report, and with such exception(s) as discussed, *infra.*

In the interests of completeness, we shall next address the fourth and final element of the total cost method before we address the defendant's contention that plaintiff is entitled to utilize only the *direct* cost method in calculating its damages.

### (d) *The Lack Of Responsibility For Additional Costs*

The fourth and final element of the total cost method turns on—whether the contractor was responsible for any of its added costs. *Servidone,* 19 Cl.Ct. at 386. We have previously held that the plaintiff is responsible for all added costs associated with the alleged rock condition inasmuch as it does not give rise to a differing site condition. With respect to any additional costs beyond that of the rock claim, the defendant avers that, notwithstanding admitting liability regarding excess water, many of the delays which occurred during construction of the project were due primarily to plaintiff's poor performance and style of management of the project. The defendant also avers that the plaintiff must establish causation, in addition to liability and injury, in order to be entitled to an equitable adjustment, and we agree. *Servidone,* 931 F.2d at 861; *Wunderlich,* 173 Ct.Cl. at 199, 351 F.2d 956. *See J.D. Hedin,* 171 Ct.Cl. 108–09, 347 F.2d at 259. It is a well-established principle of law that it is the "plaintiff's obligation in the case at bar to prove with reasonable certainty the extent of unreasonable delay which resulted from defendant's actions and to provide a basis for making a reasonable correct

approximation of the damages which arose therefrom." *Wunderlich,* 173 Ct.Cl. at 199, 351 F.2d 956. In other words, "it is incumbent upon plaintiff to show the nature and extent of the various delays for which damages are claimed and to connect them to some act of commission or omission on defendant's part." *Id.* at 200, 351 F.2d 956. Additionally, the general rule is that "[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party." *Klingensmith,* 731 F.2d at 809 (quoting *Blinderman Construction Co. v. United States,* 695 F.2d 552, 559 (Fed.Cir.1982)). Therefore, the plaintiff in the instant case can only recover if it can establish that the government delayed the work and by how much it did so. *Id.* This is true because it is well established "that the government is relieved of liability irrespective of its faulty specifications, where the actual delays were occasioned by factors outside the government's control (citations omitted)." *J.D. Hedin,* 171 Ct.Cl. at 82–83, 347 F.2d at 244.

In light of the foregoing principles, we have reserved our discussion of plaintiff's delay claim until this time since we find that said claim is closely related to the fourth element of the total cost method in that the plaintiff must prove therein that it was not responsible for any of the additional delays which resulted in any of the added costs. In this respect, we will briefly discuss (1) the court's findings as to what happened at the site during construction of the project, and (2) the plaintiff's critical path schedule purporting to delineate the total number of delay days attributable to the defendant. To the extent that we find that the plaintiff was responsible for additional costs and/or delay time, we shall modify plaintiff's recovery to reflect said responsibility. *Klingensmith,* 731 F.2d at 809. If, on the other hand, we are unable to distinguish from the record "a clear apportionment of the delay and expense" attributable to either the plaintiff or the defendant, then the plaintiff shall not be entitled to recovery of its added costs which are unapportionable. *Id.*

(i) *Brief Overview Of The Project*

According to Messrs. Gaber and Manka (Tr. 165–188, 284–354), Youngdale's first activity on the project was to have its subcontractor, Garcia Paving, grub the entire site area and then excavate the site area for Building A by moving the material in that area out into the future parking lot area. Garcia would then have to rough the soil underneath and compact it to a specified density, as required by the contract documents. After completing the Building A site, Garcia would then begin to excavate the Building B site by taking Building B's material over to Building A to construct the proper elevation for the building pad of Building A. Any excess would then go back to Building B to buttress its building pad. This approach would create an efficient path for the machinery to move around the site, given all the dirt that had to be moved. Next, Garcia would excavate the Building C site, and any additional material needed to fill up Building C's pad would come from the roadways or parking areas which were also to be compacted and built up in order to lay the asphalt. Youngdale would then create all the parking and roadway configurations at this time, and, thereafter, it would prepare for the foundations by laying out the corners of Buildings A, B, then C with the surveyor, *i.e.*, chalking out the trench configurations for said foundations, and then excavating the foundations with a backhoe until they reached the required thickness for the foundation. Youngdale would then install the rebar reinforcement and pour the concrete. According to Youngdale's plan, each building was to be completed in a specific time order so as to maximize efficiency. After the building sites were prepared, the roads and parking areas would be worked to provide a stable staging area for the project, *i.e.*, to enable access to and around the site.

While the foregoing was designed to optimize the bottom line, Youngdale was unable to proceed in a logical and efficient manner from the outset of the project, *i.e.*, March 17, 1983. First, the witnesses (Gaber and Manka) indicated that no sooner had they attempted to begin the excavation for the buildings, they encountered subsurface water. Youngdale also encountered water in the parking and roadway areas; thus, they immediately had to stop work and request the Corps to direct them as to how best to proceed. The Corps, however, refused to acknowledge that there was an excess water differing site condition. In fact, the government even went so far as to issue a Cure Notice for noncompliance with the contract, and later a notice of termination if Youngdale did not begin to substantially perform the contract. Consequently, Youngdale went back to work despite the numerous adverse conditions at the site. With regard to parking and roadway areas, however, Youngdale had to leave said areas alone since it was impossible to physically work them, and, according to Mr. Gaber's testimony, this break in the stream of work substantially affected Youngdale's work schedule throughout the entire construction project, particularly the site utilities which were to traverse between the buildings and across the parking lot as a part of the earthwork operations.[65]

Because Youngdale's entire scheduling was off from the beginning, the work which had been scheduled to be completed before the 1983/1984 winter was not fully complete. Tr. 353–54. Thus, when the rainy season came upon the area, *i.e.*, sometime in November of 1983, it was often impossible to move around the project with the heavy equipment, *i.e.*, forklifts and manlifts, required to perform the earthwork operations, particularly in those areas where there were water pockets and overly-muddy conditions. Tr. 339–40. This problem, *i.e.*, the muddy conditions, continued in varying degrees, right up until the end of the project, according to Mr. Gaber's testimony; and according to Mr. Manka,

---

65. Additionally, Mr. Gaber testified that Youngdale was further delayed in putting in the site utilities because they encountered rock and, therefore, had to stop to excavate the rock before putting in the utilities or find some other manner to go around the rock. The court notes, however, that it does not recognize any of the delays with respect to the alleged rock condition because said delays are attributable solely to the plaintiff's conduct.

Youngdale was even having difficulty spreading the excavated soil because it was extremely moist, and often Youngdale had to just wait until it dried before spreading and compacting it to the appropriate contract requirement levels. Tr. 174, 319–320.

Another problem which existed with respect to the scheduling related to the procurement of supplies and materials. Often materials would be ordered according to the original scheduling dates, and they would just sit around at the site until they could be used. For example, Mr. Gaber testified that the masonry blocks sat around at the site for quite a long time in light of the fact that Youngdale had not completed the earthwork because of the murky conditions. Moreover, Youngdale was often forced to use equipment that it had not planned on using because of the consistency of the soil. For example, instead of using scaffolding as planned, it was compelled to rent manlifts. Tr. 340–41. So, not only was the planned equipment sinking in the ground, but often Youngdale had to recruit other equipment and men to dig out the equipment which became mired in the mud. In this connection, Youngdale or its subcontractors would also have to leave the construction area to let it dry out. Tr. 321. As for Building C, which was located at the lowest and swampiest point in the site,[66] Youngdale experienced a considerable amount of difficulty in removing the materials here in that, on at least one occasion, Youngdale had to dig a hole, fill it with rock, place a barrel inside to allow the water to accumulate, and then pump the water out in order to overcome the dampness of the soil.

With respect to the pavement, Youngdale did not put it in until the end of the project because of the numerous difficulties in excavating the area as a result of the excess water in the soil. Thus, to compensate for the added difficulty in accessing the site caused by the lack of pavement early on in the project, Youngdale was forced to place truck loads of gravel over the roadways so that they could at least access the site, which, according to Mr. Manka, was not

part of the construction plans. Later on during the project construction, a significant amount of difficulty was experienced with the compaction of the soil, so much so that eventually the government had to issue a modification order so that Youngdale's subcontractor, Garcia Paving, could complete the installation of the pavement. According to the record, Garcia was able to install the pavement; however, it took an exceptionally-long time to do so, given the fact that they could not achieve the proper compaction percentage as required by the contract, i.e. 95%. This circumstance compelled the government to modify its compaction requirements to 92.5%. Therefore, because the installation of the pavement occurred at the end of the project rather than when it was scheduled to occur, i.e., earlier in the project, Youngdale suffered additional delays which would not have otherwise occurred had the pavement been completed on schedule. Tr. 182–83.

Notwithstanding these delays, Mr. Manka also testified that whenever they encountered any of the aforementioned conditions, Youngdale notified the government and would often have to wait anywhere from a week to a month to get an answer. Tr. 333. As noted previously, the record shows that Youngdale sent approximately 26 letters over the period of construction, including CO claims, to the government with reference to the excess water condition, memorializing the government's knowledge of same as early as March 17, 1983. In spite of this early and timely knowledge, the government failed to acknowledge the excess water condition until after more than seven years had passed, i.e., July 25, 1990. Clearly, the facts show that the government failed to provide timely aid to the contractor in its numerous difficulties with respect to the excess water condition. This being true, the government, nevertheless, is still of the opinion that not only is Youngdale responsible for a considerable amount of the delays which occurred at the site, but it (defendant) is also of the opinion that it is entitled to liquidated damages as a result of these

---

**66.** This was also the situs of the access road. Tr. 177–78.

alleged contractor-caused delays. The question remaining, therefore, is whether, given the foregoing, Youngdale is responsible for any of the delay days alleged by the government and any of the additional costs associated therewith.

In addressing the defendant's contention with respect to contractor-caused delays, we have reviewed defendant's submissions, including its summary schedule of delay days, and compared said delays to the exhibits cross-referenced therein. In so doing, the court observed that the majority of the delays noted therein were due to earthwork, footings for all the buildings, masonry work, roof frame, and site utilities.[67] We also find that a majority of these delays were summarily accounted for in DX 27, a letter from the authorized representative of the CO to Youngdale notifying it that due to "lack of performance and overall coordination" of the project, the government was assessing liquidated damages against it. Said letter was dated June 18, 1984, approximately *six years prior* to the government's admission of the existence of a water differing site condition. If said letter were prepared today, *i.e., after* the *government's admission* to liability with respect to the excess water differing site condition, the CO would, of course, have to rethink his position with respect to the number of delays he would attribute solely to the plaintiff and, instead, deem a significant number of those delays to be the fault of the defendant, particularly in light of the fact that said excess water condition existed throughout the period of construction of the project. Moreover, and upon further review of the record, it is not clear to the court that all the averred delays by the government as being the fault of the plaintiff were in fact caused by the plaintiff. This is especially true in light of the fact that the defendant declined to put on its case-in-chief during the trial on the merits. It would have been extremely helpful

to the court, with respect to the issue of the contractor-caused delays, had the government corroborated its documentary evidence with credible sworn testimony as to specific events with respect to which the government alleges that the contractor is responsible. Given such failure, therefore, the court is of the opinion that, based solely on the documentary evidence before it, a majority of the government's so-called plaintiff-related delay days can be explained away as resulting primarily, if not exclusively, from the excess ground water differing site condition, which existed from day one of the project. Moreover, based on the credible testimony of Messrs. Manka, Gaber, and Brinegar, all witnesses who were present at the Vandenberg site, and the reasonable inference deductible from the belated admission of defendant, it appears that the ground water condition *critically* impacted the entire construction of the project. Against this record background, we believe that the following quotation from *J.D. Hedin,* 171 Ct.Cl. at 76, 347 F.2d at 240–41, is instructive as to the proper disposition of this issue:

> There is some color of truth to defendant's contentions that plaintiff's conduct with respect to the project left much to be desired. We think, however, that the *genesis* of the difficulties which were encountered was defendant's faulty specifications and its *undue* delay in correcting them. Whatever derelictions of duty plaintiff, as a contractor, might have been guilty of were *not significant enough* to counterbalance this *initial* government-caused difficulty.

(emphasis added). We wholeheartedly agree that the foregoing ruling is thoroughly apposite to the facts here. Accordingly, we conclude that, *to the extent that Youngdale is able to prove by a preponderance of the evidence the number of delay days attributable to the excess wa-*

---

**67.** However, note that with respect to the site utilities, after reviewing the daily reports, testimony, and other documentary evidence, the court is of the opinion that a majority of the delays stem from plaintiff's encountering the rock (*i.e.,* shale) and having to adjust its scheduled activities accordingly. Therefore, because

we have already ruled that plaintiff is at fault with respect to the alleged rock condition, there is no need for the court to consider this matter further, particularly in light of our ruling that no damages shall be allowable with respect to any increased costs or delay time attributable to said condition.

*ter differing site condition*, it shall be entitled to any such days. Those delay days delineated by the government as resulting from the plaintiff's poor performance and inadequate management of the project shall be treated as non-significant in light of the fact that, based on the evidence herein, we are of the same opinion as was the court in *Hedin, i.e.*, that the majority of delays alleged by the defendant attributable to the plaintiff were "not-significant enough to counterbalance the initial government-caused difficulty," *i.e.*, the ground water differing site condition. Moreover, had the government recognized and timely acknowledged the perched water differing site condition, many of the delays attributable to the government's lack of direction with respect to the water condition would have been avoided.

In view of the foregoing, our next question, therefore, is—whether Youngdale has carried its burden by a preponderance of the evidence and is entitled to any recovery with respect to the 290 days of delay it attributes to the excess water differing site condition. In its attempt to prove such facts, Youngdale submitted a critical path method (CPM) schedule (PX 165) and the expert testimony of Mr. Donald Scarbrough, a CPM expert. Tr. 831–1311. According to the Court of Claims in *Haney v. United States*, 230 Ct.Cl. 148, 167–68, 676 F.2d 584 (1982), the CPM is described in the following manner:

> Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (*E.g.*, one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway

and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project.

Further, in *Shupe*, the Claims Court held that:

> In order to calculate delay damages, it is necessary to determine which work items on the . . . project were in the critical path and the time period that these work items remained on the critical path. The reason that the determination of the critical path is crucial to the calculation of delay damages is that *only construction work on the critical path ha[s] an impact upon the time in which the project was completed* . . . . Delay involving work not on the critical path generally had no impact on the eventual completion days of the project.

*Shupe*, 5 Cl.Ct. at 728 (emphasis added). Thus, it stands to reason that, based on the principles espoused in *Haney* and *Shupe*, the proof must show that a delay item or activity *must* be on the critical path in order for that particular delay to impact the completion of the project. This being true, the plaintiff must, by a preponderance of the evidence: (1) quantify the number of delay days attributable to the defendant, and (2) provide proof that said delay days were in fact on the critical path. Thus, we now turn to plaintiff's critical path schedule, as set forth in PX 165, and our analysis thereof.

### (ii) *Critical Path Method*

Mr. Donald Scarbrough was hired by plaintiff prior to construction of the project to develop a critical path schedule, as required by the government. In so doing, he spoke with Messrs. Gaber and Manka, and reviewed the plans and specifications in order to develop the logic of the network to determine what had to be done to complete this project, in short, a diagram of the project. According to Mr. Scarbrough's testimony, he developed three work product schedules for the plaintiff. The first

was the As–Planned Schedule,[68] then the As–Built Schedule,[69] and finally, the As–Built No Delays Schedule.[70] Tr. 966–67. All three schedules disclose a report date of October 10, 1991, with 8 runs for the As–Planned, 153 runs for the As–Built, and 61 runs for the As–Built No Delays. PX 165 and Tr. 1025–26.

Plaintiff's expert's report further states, on page 2, as follows:

> The as-built schedule was prepared from the daily reports, project correspondence, interviews with persons responsible for managing the contract, as well as other sources. Although the daily reports are excellent through May 1984 (the date Mr. Manka left the job), they became less so after that date. The correspondence initiated after this date is also less useful, as the contractor made a decision about this time to complete the job as expeditiously as possible, without regard to the conditions or the amount of cost. *After June, activities from the approved as-planned schedule were used instead of actual activities.* Activities, prior to June, were actual and those following June were as planned.

(emphasis added). *See also* Tr. 1033–35. Given the foregoing, we note that the plaintiff, as well as his CPM expert, postulates that there were *290 total delay days* solely attributable to the government. First, the plaintiff indicates that it is entitled to 206 government-caused delay days from the beginning of the project until June 19, 1984; and secondly, plaintiff contends that it is entitled to an additional 84 government-caused delay days after June 19, 1984, to completion of the project. With respect to the latter period, we conclude that said

contention is not supported by creditable evidence, let alone by a preponderance of the evidence. Therefore, we are compelled to deny this aspect of plaintiff's claimed delay days because admittedly they are not determined from "As–Built" activities. Tr. 1035. That is to say, according to Mr. Scarbrough's testimony, that portion of the As–Built Schedule delineating the delays which occurred *after* June 19, 1984, was based upon the As–Planned Schedule, which is a *mere projection* of what might occur with respect to construction of the project and not historical fact. Tr. 1034–37. The only averred delay days remaining within the court's consideration, therefore, are the alleged 206 government-caused delay days which occurred from March 1983 to June of 1984.[71]

In reviewing Mr. Scarbrough's three detailed CPM schedules, against this background, the court observed that there were numerous nebulous discrepancies in PX 165 which were irreconcilable to the testimony adduced at trial. Given the complexities of same, we shall discuss them in full in Appendix–B to this opinion. For our present purposes, therefore, we shall merely delineate in this body those errors which we deem to be undeniable obstacles to crediting plaintiff's expert's opinion report with respect to the alleged 206 delay days. First, and according to Mr. Scarbrough's testimony, the "As–Built Without Delay" Schedule depicts the project as it would have occurred *but for* the government-caused delays. Tr. 1023. However, following extensive cross-examination by the defendant, Mr. Scarbrough essentially admitted that the As–Built No Delay Schedule contains numerous errors and is questionable as a tool to prove plaintiff's entitle-

**68.** The As–Planned Schedule indicates that the project was to be completed in 450 days. PX 165.

**69.** The As–Built Schedule indicates that it actually took 657 days to complete the contract. PX 165.

**70.** The As–Built No Delays Schedule depicts the completion of the project as it would have been but for the government's delays, and that, in this analysis, the project would have been completed in 359 days. PX 165.

**71.** Moreover, Mr. Scarbrough's *report only* contends that "the project was delayed two hundred and six (206) calendar days by the government's failure to respond to the differing site conditions." PX 165, p. 1. At trial, however, Mr. Scarbrough testified on direct that in his opinion the government delayed the project—(i) beyond the contract completion date, in excess of 190 days; (ii) beyond Youngdale's scheduled completion date, in excess of 290 days; and (iii) in excess of 320 delay days by its acts. Tr. 1002–03.

ment. Tr. 1052–87. In that connection, Mr. Scarbrough testified as follows:

> I did not put a lot of care into this As–Built [No Delays]—it was done very swiftly, very quickly. I don't put a lot of store into compressed As But For schedules. They are simply one more way of testing the results of the information that we found by the very careful analysis in the As–Built. Once I got the first pass through and showed that it was in the ballpark, *I didn't evaluate it,* I didn't look at it. I just took a very rough approach to it. I just threw out all things that were delays [and said] ... "computer take out all the delays." The result is that we have these errors. I apologize. Since I submitted this to the Court, I should have double checked for these errors.

Tr. 1086 (emphasis added). Given the foregoing testimony of plaintiff's expert with respect to the disparagement of its own As–Built No Delay Schedule, such is clearly sufficient for this court to find that it is not reliable or credible with respect to plaintiff's delay claim. Thus, the court is thereby clearly justified in holding that it is more probable than not that plaintiff fails to establish the facts which it purports to convey. Consequently, the only ostensibly credible schedule which remains as to plaintiff's claimed delay days attributable to defendant is the As–Built Schedule.

Simply put, and *based on plaintiff's contentions,* the court *should* be able to review the As–Built Schedule and Mr. Scarbrough's testimony, and determine therefrom the number of delay days *solely,* and not concurrently, attributable to government-caused activities that are deemed to be on the critical path. However, we find, on this record, that is not true. According to the evidence in the record, *i.e.,* PX 165 and the testimony of Mr. Scarbrough, the As–Built Schedule purports to depict the various activities which took place throughout the project in the manner in which they actually occurred. Presumably, said information came from the daily logs, as well as other evidence in the record, including discussions with Messrs. Manka, Gaber, and Youngdale, and other employees. However, we find, on this record, that many of plaintiff's major premises are not true because, when the court attempted to cross-check a particular alleged task or delay as to its time frame with the daily logs, said items were not depicted as referenced in the schedule.[72] Moreover, the court has no

---

**72.** For example, on the As–Built Schedule, the following, but not limited to, inconsistencies were noted with respect to various averred critical path activity codes:

(i) Activity code 120, entitled "SURVEY" indicates that a Survey took place sometime between May 17, 1983 and June 8, 1983, and that said survey took 5 days to complete. In reviewing the relevant daily report, the court could find no reference to said survey anywhere within the specified dated time frame that was indicated in plaintiff's CPM report.

(ii) Activity codes 520 and 524, entitled "C BLDG PAD," indicate that earthwork on Building C commenced on May 23, 1983, and continued through the following periods: May 23, 1983—May 28, 1983; and June 26, 1983 to June 28, 1983. The daily reports indicate otherwise. According to said reports, Building C's earthwork began on May 24, 1983, and stopped on May 26, 1983, and stopped. It began again on June 1, 1983, continued for another two days, *i.e.,* up to and including June 3, 1983, and was not mentioned again until June 14, 1983. With respect to the remaining days noted in the CPM report, *i.e.,* June 15–17, said daily reports make no mention of work being performed on Building C. With respect to the report's June 26–28 dates, the daily reports indicate that work on Building C occurred only on the 27th and 28th. No work was done on June 26, 1983.

(iii) Finally, activity code 926, entitled "WET SITE CONDITIONS," indicates that with respect to this code number, said wet site conditions occurred from December 30, 1983 to February 21, 1984, for a total of *54* days. The court in reviewing the relevant daily reports, however, notes that the daily report for December 30, 1983, makes no mention of any type of wet site conditions, and that the first such indication did not occur until January 3, 1984. From that point on, the following daily reports indicated that the project was being effected by "wet site conditions":

| Daily Report Dates | Number of Calendar Days Included |
|---|---|
| January 3—January 6, 1984 | 4 days |
| January 10—January 12, 1984 | 3 days |
| January 17, 1984 | 1 day |
| January 19, 1984 | 1 day |
| January 27, 1984 | 1 day |
| February 2, 1984 | 1 day |
| February 8—February 21 | 14 days |
| TOTAL | 25 days. |

way of determining exactly what particular activities make up a task as it is labelled by Mr. Scarbrough. Nor is there any probative evidence in the record as to *how* Mr. Scarbrough specifically determined the duration of each of the particular tasks and their alleged related delays, nor is there any testimony explicating such fact. Thus, given the failure of the plaintiff to point to any probative corroborating evidence in the record (regarding PX 165) specifically explicating activities on the critical path, and how the duration of each was established, save rank speculation, the court was completely unable to verify any of Mr. Scarbrough's assertions as to the alleged number of delay days *solely* attributable to defendant, or whether said alleged delays related to the defendant's actions or the plaintiff's actions. Tr. 1050–55, 1109–11. Furthermore, Mr. Scarbrough was unable to clarify to the court how the errors in his report (*i.e.*, with respect to contract extensions by the government, Tr. 1023–24, the inclusion of non-work days, *i.e.*, weekends and holidays, Tr. 1099–1102) effected the overall accuracy of the As–Built report. Tr. 1023–1152. (*See* Appendix–B, incorporated herein by reference.) Accordingly, based on the record as a whole, the court is compelled to conclude that plaintiff's expert's report is not sufficiently credible to carry its burden by the requisite quantum of proof in light of (i) the manner in which various aspects of the report were prepared, (ii) the inability of the court to determine the precise effect the errors in plaintiff's report had on the overall delay claim of 206 days, and (iii) the lack of probative evidence as to what delays were specifically attributable to the defendant or to the plaintiff, given that plaintiff's but-for

schedule was discredited *by plaintiff's own expert witness.* The predecessor Court of Claims stated in *Sternberger v. United States,* 185 Ct.Cl. 528, 535–36, 401 F.2d 1012 (1968), that—[e]ven uncontradicted opinion testimony is not conclusive if it is intrinsically nonpersuasive. *Also see Dayton Power & Light v. Commissioner,* 292 U.S. 290, 299, 54 S.Ct. 647, 652, 78 L.Ed. 1267 (1934), where the Supreme Court stated that "... opinions ... even if entitled to some weight, have no such conclusive force that there is error of law in refusing to follow them. *This is true of opinion evidence generally.....*" (emphasis added). The court is, of course, aware that the determination and calculation of damages in such cases are not an exact science, and that a reasonable approximation may be appropriate in some instances; *S.W. Electronics & Manufacturing Corp. v. United States,* 228 Ct.Cl. 333, 351, 655 F.2d 1078 (1981); however, the court in this instant is unable to reasonably rely upon the expert report submitted herein, nor is it able to reasonably approximate, on this record, the number of delay days clearly attributable to the government based on the evidence before it. Thus, we will not speculate and, therefore, are constrained to hold that plaintiff is not entitled to the 206 days of delay alleged in its post-trial submissions, inasmuch as it has failed to carry its burden by a preponderance of the evidence.[73]

Notwithstanding the foregoing grave deficiencies we find in plaintiff's proof, the court must, nevertheless, conclude on this record that Youngdale in fact suffered a significant number of delay days stemming from the excess water differing site condition. Whether or not there were 206 days of delay attributable specifically to the gov-

---

Given the foregoing analysis, it appears to the court that the daily reports do not support plaintiff's calculation of 54 days within its As–Built report, PX 165.

**73.** The court further observes that the plaintiff provided the court with detailed summary schedules of its critical path method in its Supplemental Memorandum To Post–Trial Brief filed on February 18, 1992; however, the court also found numerous errors therein, and has so delineated said errors in its Appendix–B accordingly.

Moreover, the court has reviewed Tab 2 of said supplemental memorandum, wherein the plaintiff attempts to cross-reference its critical path delay days to the daily reports, the Construction Quality Control (CQC) reports, and the testimony adduced at trial. However, upon review of said data, the court is still unable to determine within a reasonable approximation that the plaintiff, more probably than not, incurred 206 delay days as a result of the government's activities at the Vandenberg Air Force Base.

ernment is undeterminable, as expressed *supra.* Notwithstanding, we deem it appropriate, in light of plaintiff's deficiencies in proof, to find on this record that Youngdale is clearly entitled to some substantive recovery given the defendant's judicial admission as to liability to the costs, and the delay days implicitly attributable to said admitted additional costs, in its auditor's report, *i.e.,* DX 50. Consequently, to the extent that the plaintiff has proven any portion of its additional costs, as delineated in its June 2, 1988 claim, which was audited by the government, the court shall allow said admitted costs and any related delay days *sub silentio* attributable to said conceded additional costs.[74] Accordingly, we shall next address defendant's judicial admission, *i.e.,* the audit report, DX 50.

### 2. The Direct Cost Method

Since we have held that plaintiff is not entitled to calculate its damages pursuant to either the total cost method or the modified total cost method, the sole viable alternative is the direct cost method. In this connection, based on the audit of plaintiff's June 2, 1998 claim, the defendant has conceded that the plaintiff's records verify "the quantum or cost considerations of [its] claim" to the extent of $210,433 of the $875,205 sought for the excess water and rock differing site conditions. If it were not for this concession, verified in the defendant's audit report (DX 50), the plaintiff would have failed to carry its burden, by a preponderance of evidence, with respect to its alleged damages. We shall address hereinafter defendant's contention that plaintiff is entitled to only $210,433[75] in

additional costs pursuant to the admission contained in the government auditor's report.

During the trial on the merits, the defendant declined to put on its case-in-chief. In short, defendant apparently relied solely on what it deemed to be grave deficiencies in plaintiff's proof, its cross-examination of plaintiff's witness, and the documentary evidence submitted at trial. Primary among the foregoing is DX 50, the Defense Contract Audit Agency's (DCAA) audit report of Youngdale's June 2, 1988 claim. This was the last claim submitted by Youngdale to the CO before filing its petition in this court. That claim encompasses all the alleged direct and indirect costs as well as the impact costs attributable to the excess water and alleged rock differing site conditions known to the plaintiff at the time it submitted the certified claim to the CO on June 2, 1988. PX 159. The resulting government report audited the entire claim contained in Youngdale's June 2, 1988 claim, including any claims referenced therein which were previously and separately submitted to the CO. The court is aware that the defendant did not put the auditor on the stand to testify as to how the audit was conducted; to what extent plaintiff's records failed to corroborate said claim, beyond the explanations contained in the report; and we are equally mindful of the fact that plaintiff stipulated to or voiced no objection to the admissibility of the audit report, DX 50.

Defendant strenuously contends that the court should accept the auditor's report as probative of the outer limits to plaintiff's entitlement for all damages stemming from

---

**74.** In plaintiff's June 2, 1988 claim, the plaintiff indicated that it is entitled to 127 delay days with respect to its four direct cost claims, including 17 days for the rock condition, and that it is entitled to an additional 69 days of extended overhead as a result of its impact claim contained therein. PX 159. Thus, in total, the plaintiff claims approximately 196 days of delay. Given that said days are not specifically referenced to the costs associated therewith, the court is unable to determine with any degree of specificity as to what days are actually allowed. However, as previously held herein, to the extent that any costs are allowed by the court with respect to said audit report, the plaintiff shall be

entitled to those delay days attributable to said costs.

**75.** On page two of the audit report, the DCAA auditor states that he questioned $631,565 of the $875,205 claimed by the contractor. The defendant then subtracts the former figure from the latter figure, and gets $243,640, which includes $33,207 for plaintiff's *rock* claim. Defendant then subtracts the $33,207 which represents the rock claim costs, which it does not concede is a differing site condition, from the aforementioned figure and comes up with a grand total of $210,433. DML, p. 19.

the water differing site condition. The basis for the foregoing position is that—plaintiff failed to introduce any evidence contrary or in rebuttal to the audit report. To the above, the court adds—the adverse inference to be drawn from the failure of plaintiff to introduce its primary books and records which admittedly were in the courtroom during the trial.[76] *Hoffman,* 298 F.2d 784, 788 (3d Cir.1962) (failure to introduce evidence within possession gives rise to the presumption that, if produced, it will be unfavorable).

We now turn specifically to plaintiff's June 2, 1988 certified claim and the DCAA auditor's report of said claim. PX 159 and DX 50. First, the June 2, 1988 certified claim asserted the following items of additional costs: [77]

| Item | Amount |
|---|---|
| (1) CP–1, Excess Water Differing Site Claim | $163,183.00 |
| (2) CP–8, Removal of Unsuitable Soil Under Buildings | 37,507.00 |
| (3) CP–9, 14, 15, Removal of Unsuitable Soil Under Parkways and Roadways; Change Grading; Change Storm Drain Outlets | 169,556.00 |
| (4) CP–20, Rock Excavation | 50,322.00 |
| **Total Direct Costs** | **$420,568.00** |

(5) Impact Claim:

| | | |
|---|---|---|
| (a) Extended Overhead | $ 81,903.00 | |
| (b) Inefficiency Claim | 95,132.00 | |
| (c) Material and Equipment | 5,925.00 | |
| (d) Out-of-Sequence Work | 228,188.00 | |
| Subtotal Indirect Costs | $411,148.00 | |
| Profit (10%) | $ 41,115.00 | |
| Bond (.525%) | $ 2,374.00 | |
| Total Indirect Costs | | $454,637.00 |
| Grand Total | | $875,205.00 |

The DCAA audit was conducted in accordance with generally-accepted government auditing standards. In that connection, the primary focus was to assure that the claim was free of material misstatement with respect to alleged cost considerations. However, because worksheets or schedules that would provide supporting detail "between the claimed cost and its financial data were not provided by the contractor[ ]," the auditors "consider the contractor's claim to be inadequate...." *See* DX 50, p. 2. Given such circumstance, the audit report questioned $631,565 of the claimed $875,205, and concluded that said claimed amount is not free of material misstatement.

The following schedule depicts the contractor's claimed costs considered by the auditor, those costs questioned (deemed not proven) by the auditor and this court, and such claimed costs considered proven by the court. We conclude, on this record, in particular based on DX 50, that plaintiff is entitled to additional costs due to the water differing site condition in the amount of

**76.** More importantly, as was stated in *Baifield Indus. Div. of A–T–O, Inc.,* ASBCA Nos. 13,418, 13,555 and 17,241, 77–1 BCA ¶ 12,308, at p. 59,455, 1976 WL 2080 (1976), *aff'd,* 706 F.2d 320 (Fed.Cir.1983)—"We cannot conceive that a responsible contractor would knowingly incur millions of dollars, for which it considered the Government to be responsible, without maintaining records of the costs claimed to be the Government's responsibility. [The contractor] kept extensive records but, in support of its quantum claim, has presented none [at trial] identifying Government responsibility."

**77.** In plaintiff's June 2, 1988 claim, which encompasses all prior claims, the plaintiff delineates the amount of delay days attributable to each claim.

$343,774, a net increase of $100,134,[78] which we will discuss, *infra,* over the amount which defendant's audit report concedes ($243,640).

| | SUMMARY | | | |
|---|---|---|---|---|
| Items | Contractor Claimed | Auditor Questioned | Additional Court Adjustments | Total |
| Direct Costs: | | | | |
| –CP–1 | $163,183 | ($ 52,138) | $11,051 | $122,096 |
| –CP–8 | 37,507 | ( 15,218) | 1,139 | 23,428 |
| –CP–9, 14, 15 | 169,556 | ( 169,556) | —0— | —0— |
| –CP–20 (rock) | 50,322 | ( 17,115) | ($33,207) | —0— |
| | $420,568 | $254,027 | ($21,017) | $145,524 |
| Impact Costs | | | | |
| Extended O/H: | | | | |
| –Field O/H | $ 56,787 | ($ 19,389) | —0— | $ 37,398 |
| –Home Office O/H [79] | 25,116 | 7,245 | —0— | 32,361 |
| | $ 81,903 | $ 12,144 | | $ 69,759 |
| Weather Inefficiency: | | | | |
| –Labor | $ 80,417[80] | ($ 80,417) | $20,250 | $ 20,250 |
| –Equipment | 14,715 | 8,175 | —0— | 6,540 |
| | $ 95,132 | $ 88,592 | $20,250 | $ 26,790 |
| Material/Equipment Storage | $ 5,925 | $ 5,527 | —0— | $ 398 |
| Out-of-Sequence Work | $228,188[81] | $228,188 | $ 82,339 | $ 82,339 |
| Subtotal | $411,148 | $334,451 | $102,589 | $179,286 |
| Profit 10% | 41,115 | 41,115 | 17,929 | 17,929 |
| Bond | 2,374 | 1,972 | 633 | 1,035 |
| Total Impact Damages | $454,637 | $377,538 | $121,151 | $198,250 |
| Total Direct and Impact | $875,205 | $631,565 | $100,134 | $343,774. |

After carefully and critically analyzing all of the questioned costs contained in the auditor's report with respect to plaintiff's impact claim and direct costs, the court is of the opinion that the following costs should be allowable, in addition to $243,-640 [82] in costs conceded by the *auditor* to have been established.

Those additional costs we deemed are allowable, based on this record; will be briefly discussed, seriatim, as follows:

Impact Costs:
| | |
|---|---|
| Weather Inefficiency—Labor | $ 20,250 |
| Out–Of–Sequence Work | 82,339 |
| | $102,589 |

Direct Costs
| | |
|---|---|
| CP–1 Profit (10% @ $110,509) | 11,051 |
| CP–8 Profit (10% @ $11,389) | 1,139 |
| CP–20 Rock | (33,207) |
| | $ 81,572 |

78. Within this *net* increase of $100,134, the court has adjusted for plaintiff's rock claim, *i.e.,* it has disallowed said claim in full.

79. Youngdale's home office overhead was calculated using the *Eichleay* formula. The government auditor also utilized the *Eichleay* formula in recalculating Youngdale's home office overhead.

80. Said cost was computed as follows: $201,043 labor base costs × 40% = $80,417.

81. Said cost was computed as follows: $1,081,526 total labor minus $168,775 weather inefficiency = $912,751 × 25% = $228,188.

82. While the auditor verified $243,640 of the total $875,205 claim, the defendant herein strenuously argues that the conceded amount is only $210,433 inasmuch as $33,207 of the rock differing site condition is included. Because we have held there is no rock differing site condition, such rock costs are not allowable.

| | |
|---|---:|
| Profit | 17,929 |
| | 99,501 |
| Bond | 633 |
| Net Adjustment | $100,134. |

*Weather Inefficiency—Labor:*

Upon examination, the auditor disallowed said amount ($80,417) in full because—he deemed that plaintiff's 40% inefficiency factor is unsupported by any creditable evidence; the base labor costs incurred during the period was only $155,245 and not $201,043; and it questioned the method used in applying the factor. The auditor acknowledged that the revised methodology would be more appropriate and reliable, and we agree.

| Item | Contractor Claimed | Revised Methodology |
|---|---|---|
| Labor (10/1/83–3/1/84) | $201,043 | $155,245 |
| Claimed Methodology | ×40% | |
| Revised Methodology | | ÷115% |
| Total Efficient Labor | | 134,995 |
| Total Inefficient Labor | $ 80,417 | $ 20,250. |

The court is of the opinion, on this record, that the plaintiff is entitled to reasonable additional costs with respect to its weather inefficiencies notwithstanding proof deficiencies. This is particularly true since it is very clear from the record that the plaintiff suffered said inefficiencies as a result of the numerous delays which existed from the outset of construction and continued throughout the construction of the project. Therefore, based on *all* the evidence submitted on the record, the court finds that a reasonable proper labor inefficiency rate is 15%. In addition, the court has recalculated Youngdale's inefficiency costs utilizing the auditor's suggested base labor amount of $155,245 and the auditor's new methodology of determining said inefficiency costs, for a total allowable labor inefficiency cost of $20,250. We, therefore, have disallowed only $60,167 of plaintiff's claimed $80,417 of inefficient labor costs.

*Out–Of–Sequence Work:*

Similar to the analysis above, the court also determines that plaintiff is entitled to some reasonable recovery due to out-of-sequence work. As above, on examination the auditor disallowed the $228,188 claimed amount in full because—there is no support for the proposed 25% inefficiency factor; the base labor cost used is questionable; the field overhead labor must be adjusted out in that it is included in the field overhead section; and they similarly questioned the method used in applying the factor. Again, the auditor conceded that a revised methodology, with the foregoing adjustments, would be more reliable, and we also agree here.

| Item | Contractor Claimed | Revised Methodology |
|---|---|---|
| Total Labor | | $1,204,302 |
| Less Field Overhead Labor | | 143,330 |
| Subtotal | $1,081,526 | $1,060,972 |
| Less Weather Inefficiency | 168,775 | 155,245 |
| | $ 912,751 | $ 905,727 |
| Inefficiency Factor: | | |
| Claimed Methodology | × 25% | |
| Revised Methodology | | ÷ 110% |
| | | $ 823,388 |
| Total Inefficient Labor | $ 228,188 | $ 82,339. |

As above, we have concluded that the plaintiff is reasonably entitled to at least a 10% inefficiency factor with respect to its out of sequence work, and that in utilizing said figure premised on the auditor's base labor costs and revised methodology, Youngdale is entitled to *an additional* $82,339 in allowable out-of-sequence costs. Given the foregoing, the court has, therefore, disallowed only $145,849 of the $228,-188 claimed by the plaintiff (and disallowed by the auditor) with respect to said additional cost.

*Profit:*

In addition to the foregoing changes with respect to the auditor's report, the court observes that the auditor disallowed Youngdale's profit in full ($41,115) on the additional costs relating to the impact claim. According to the auditor, the reasoning justifying said disallowance is that under DAR 7–602.46(b), Suspension of Work, the contractor is not entitled to prof-it on damages calculated thereunder. In this regard, we agree. However, with respect to the instant case, the plaintiff herein is requesting profit on its additional costs stemming from a differing site condition, and not from suspension of work. Specifically, Defense Regulation (DAR) 7–602.4, which is applicable to the differing site conditions clause, does not delineate whether profit is allowable. Consistent with this circumstance, the court in *Servidone* clearly provided that a plaintiff "is entitled to reasonable profit on additional costs allowed in connection with the [differing site conditions] equitable adjustment." *Servidone*, 19 Cl.Ct. at 386. We agree with the court's ruling in *Servidone* on this issue, and hereby hold that plaintiff is entitled to profit on its differing site condition equitable adjustment claim. This being true, the following schedule depicts Youngdale's entitled impact damages per the court's review:

#### Impact Claim—Court's Adjustment of Auditor's Report

| Cost Element | Contractor's Claim | Court's Questioned Costs |
|---|---|---|
| Field Overhead | $ 56,787 | $ 19,389 |
| Home Office Overhead | 25,116 | (7,245) |
| Weather Inefficiency: | | |
| Labor | 80,417 | 60,167 |
| Equipment | 14,715 | 8,175 |
| Material and Equipment Storage | 5,925 | 5,527 |
| Out of Sequence Work | 228,188 | 145,849 |
| Subtotal | $411,148 | $231,862 |
| Profit (10%) | 41,115 | 23,186 |
| Bond (.525%) | 2,374 | 1,339 |
| Total | $454,637 | $256,387 |
| Total Allowed Costs: | $198,250. | |

Thus, with respect to plaintiff's *impact claim*, plaintiff is entitled to recover an additional $121,151 ($20,250—Weather Inefficiency + $82,339—Out-of-Sequence Work + $17,929—Profit + $1,035—Bond).

Our next inquiry is with respect to the direct cost claims contained in the June 2, 1988 composite claim. Said claims were also audited by the government's auditor to determine the efficacy of Youngdale's contentions therein. With regard to these direct cost claims, the court found that, based on the record, there was no reason to modify the auditor's findings except in two instances; first, the rock claim of $33,207 was allowed by the auditor; and secondly, profit was not allowed on the proven direct costs CP–1 and CP–8. With respect to the rock claim, the court has previously ruled that plaintiff is not entitled to recover *any* damages with respect to said claim. Consequently, the court has disallowed the rock claim costs in full and adjusted for allowable profit. And, finally, with respect to the allowed direct costs regarding CP–1 and CP–8, we have allowed reasonable profit of 10% in the amounts of $11,051 and $1,139, respectively. Thus, the following schedule depicts (i) Youngdale's claimed direct cost claims, (ii) the related questioned costs, and (iii) the court's allowable impact (indirect) costs, for a total allowable cost of $343,774.[83]

### SUMMARY OF COURT'S NET ADJUSTMENT PER AUDITOR'S REPORT

| Cost Element | Contractor's Claim | Court's Questioned Costs |
|---|---|---|
| CP–1—Excess Water Condition | $163,183 | $ 41,087 |
| CP–8—Unsuitable Soil Bldgs. | 37,507 | 14,079 |
| CP–9—Unsuitable Soil Pkwys & Roads | 169,556 | 169,556 |
| CP–20—Rock | 50,322 | 50,322[84] |
| Total Direct Costs | $420,568 | $275,044 |
| Total Indirect Costs | $454,637 | 256,387 |
| Total Costs | $875,205 | $531,431 |
| Total Allowed Costs: | $343,774. | |

Based on our foregoing determination as to Youngdale's entitled damages claim, we shall now very briefly address plaintiff's other miscellaneous methods of recovery.

### 3. *Other Methods of Recovery of Damages*

In light of our foregoing holdings with respect to plaintiff's failure to prove its

**83.** Youngdale in its complaint and its post-trial submissions requested the court to award it $25,000 for a settlement claim that Youngdale *allegedly paid* to its subcontractor Garcia Paving. The record is void of any probative evidence that plaintiff, in fact, paid said claim, or even that it incurred said costs. As a result, we are constrained to conclude that Youngdale has failed to carry its burden with respect to said subcontractor claim and is, therefore, not entitled to the additional $25,000 in costs. The court noted that in its direct cost claims contained in the June 2, 1988 claim, Youngdale included over $100,000 in costs relating to Garcia Paving. Whether said costs included the $25,000 which the plaintiff alleges that the defendant owes it as a result of the excess water condition is indeterminable based on the failure of proof.

**84.** The auditor allowed $33,207 with respect to this claim; the court, however, has denied said costs in full for the reasons addressed supra.

costs by a preponderance of the evidence, and the fact that we have previously determined that based on the record herein the plaintiff is entitled to relief solely under the direct cost method, the court finds it unnecessary, at this time, to address plaintiff's alternative methods of calculating damages, *i.e.,* the Productivity Comparison method, the Estimated Evaluation Approach, the Jury Verdict method, and the Cost Plus method. In short, we have concluded, *supra,* that the plaintiff has failed to offer any probative evidence *supported by its books and records* to otherwise affirmatively substantiate any of the costs which it may have incurred. Consequently, there is·no rational basis upon which this court may reasonably determine plaintiff's method of calculating damages beyond that which it has already done, *i.e.,* the direct cost method buttressed by DX 50. Therefore, and finally, we shall next address plaintiff's interest and liquidated damages claims, seriatim.

## C. INTEREST

The defendant has conceded liability with respect to the excess ground water differing site condition, and the court has appropriately assessed damages based on the record. Interest, therefore, shall be appropriately assessed with respect to the excess ground water differing site condition since we found no liability regarding the rock condition.

In light of the above, the threshold issue with respect to the quantum of interest entitlement—is *when* does interest begin to accrue on damages under the CDA. Two secondary issues also exist as to—(i) whether Youngdale's claim, to be a proper claim upon which interest may accrue, was duly *certified* and *quantified* when filed; and (ii) whether Youngdale may relate

back, for the running of interest, any subsequently filed claims [85] to the initially-filed efficacious claim with respect to the water condition. Plaintiff opines that its initially-filed claim of May 26, 1983, is a proper claim to commence the running of interest in spite of the failure to quantify, because said claim was properly certified. Plaintiff further contends that, in light of the Federal Circuit's recent ruling in *Servidone,* said interest should accrue from May 26, 1983, as to the *entire* ground water claim. *See Servidone,* 931 F.2d at 862.[86] Consequently, the defendant contends that interest may not run from May 26, 1983, simply because the claim received by the CO on that date is not an efficacious claim under the CDA in that it avers neither a quantum due or a sum certain. Additionally, the defendant contends that, in reviewing the numerous claims submitted by Youngdale to the CO, the court should allow interest only as of the date the CO received a particular claim and only on the amount claimed within that particular claim. According to the defendant, each of plaintiff's several claims filed with the CO are based upon different facts and theories of recovery; thus, they cannot be consolidated into one claim and then related back to Youngdale's initial claim for purposes of calculating the total interest due the plaintiff. In short, argues defendant, Youngdale may recover interest commencing only upon each claim as of the date it was filed, and, more importantly, only up to and including that averred within *that* claim.

Given the conflicting contentions of the parties as to the date interest shall commence, and the fact that Youngdale filed *several* claims with the CO, a brief overview of the multiple claims submitted by Youngdale is appropriate. Accordingly, the following chart summarizes the opera-

---

**85.** Youngdale filed several separate claims with the CO relating to the excess water condition. The question is—may Youngdale aggregate all of those claims and relate them back to its initially-filed water claim for the purpose of calculating the commencing of the interest due on said claims.

**86.** In *Servidone,* the Federal Circuit found that "[a]t the time it filed a proper claim, Servidone had yet to incur the total costs which it later recovered. Nonetheless Section 611 [of the CDA] awards interest on any amounts later 'found due ... from the date the contracting officer receives the claim.'" *Servidone,* 931 F.2d at 862 (quoting 41 U.S.C. § 611 (1982) in pertinent part).

tive facts relevant to the critical elements constituting a viable claim:

| Date Of Claim | Amount Quantified | Signed Claim | Certified[87] | Comments |
|---|---|---|---|---|
| 5/26/83 | No | No | No | PX66—water DSC. |
| 8/8/83 | $169,556 (Complaint)<br>$ 49,001 (Claim) | Yes | No | PX96—water DSC (document reflects $49,000; complaint, judicial admission concedes $169,556).[88] |
| 1/4/84 | $ 50,322 (Complaint)<br>($-0-Claim) | Yes | No | PX 128—excavating rock (document reflects "zero" amount, complaint, judicial admission concedes $50,322). |
| 5/29/84 | $ 37,507 | No | No | PX 147—to remove rock/shale —unsuitable soil/water. |
| 3/25/85 | $163,183 | Yes | Yes | PX 151—addendum to 5/26/83 claim—water, unsuitable soil material. |
| 11/11/86 | $843,650 | No | No | PX 154—water/soil unsuitable —rock. |
| 6/2/88 | $874,982 | Yes | Yes | PX 159—direct costs removal of unsuitable soil material plus impact costs. |

■ Applying the aforementioned facts to the primary issue herein, *i.e.*, *when* does interest begin to accrue under the CDA, we look to both the statute itself and the prevailing case law relevant to the subject issue. First, the language in 41 U.S.C. § 611 reads as follows:

Interest on amounts found due contractors on *claims* shall be paid to the contractor *from the date the contracting officer receives the claim* pursuant to section 6(a) [41 U.S.C. § 605(a) ][89] from the contractor until payment thereof.

41 U.S.C. § 611 (1982) (emphasis added). The legislative history of § 611 indicates that the section was *originally* drafted so that interest would run from "the date the

---

**87.** In order to be effective, the certification statement must be signed by an authorizing official of the party to be charged. 48 C.F.R. § 33.207(c)(2). Inherent in the certification requirement as construed through the legislative history of § 605(c)(1), and by the ordinary meaning of the term itself, the term "certify" clearly requires that one attesting to the truth of the certification must necessarily sign it in order to be held accountable for any falsities contained therein. *See Fidelity and Deposit Co. of Maryland v. United States*, 2 Cl.Ct. 137, 144 (1983) (citing Contract Disputes Act of 1978: Joint Hearings on S. 2292, S. 2787 and S. 3178, before the Subcomm. on Federal Spending Practices and Open Government of the Senate Subcomm. on Citizens and Shareholder Rights and Remedies of the Senate Comm. on the Judiciary, 95th Cong., 2d Sess. 21 (1978)).

**88.** This variance is understood on the basis that PX 96 as submitted apparently was not complete. This is true because there are three separate parts to the claim identified as "Item No. 1; Item No. 2; and Item No. 3." The first two contain a quantified amount but the third item appears to be missing a page or pages in that said Item No. 3 is not similarly quantified. On this record, therefore, it is reasonable to infer, given the judicial admission of plaintiff in its complaint, that said filed claim totaled $169,-556; that Items No. 1 and 2 thereof aggregated $49,001; and that the missing page(s) quantifying Item No. 3 must have totaled the difference, *i.e.*, $120,555 ($169,556 − $49,001). Thus, we find that the August 8, 1983 claim, as allegedly filed, was in the amount of $169,556, was not certified, as required, and, therefore, not a valid claim.

**89.** Section 605(a) states that "all claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (1982).

claim accrues." However, Congress, in its wisdom, saw fit to change that provision to read from "the date the contracting officer receives the claim pursuant to § 605(a)" of the CDA. The rationale behind the change to a specific *red-letter*[90] date was to avoid any potential confusion with respect to the actual date when interest would start to run, moreover, to serve as an incentive for contractors to submit claims as soon as they are identified. 124 Cong.Rec. S. 36267 (1978). *See Servidone*, 931 F.2d at 862–63; and *Fidelity Constr. Co. v. United States*, 700 F.2d 1379, 1385 (Fed.Cir.) *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983). Given the foregoing precedent, it is, therefore, clear beyond cavil that interest begins to run, in all instances, from the date that the CO *receives* the contractor's "proper claim." *Id.* at 862.

This legal analysis, however, is not the end of our interest evaluation here because the defendant further contends that the claim submitted to the CO must, of course, first be appropriately *certified* and *quantified* to be a *proper* claim sufficient to activate the running of interest, and we agree. *See Skelly & Loy v. United States*, 231 Ct.Cl. 370, 685 F.2d 414 (1982); *Fidelity Construction*, 700 F.2d at 1384 ("an uncertified claim ... is ... a legal nullity and therefore no interest can accrue"). *Essex Electro Engineers v. United States*, 702 F.2d 998 (Fed.Cir.1983) (emphasizing the court's finding in *Fidelity*); and *Re-Con Paving, Inc. v. United States*, 745 F.2d 34 (Fed.Cir.1984). Based on the foregoing cases, it is clear that they establish the fact that a *proper* claim upon which interest may begin to run, once received by the CO, is one that is duly certified.

As noted, *supra*, FAR establishes that a valid claim must also "demand ... the payment of money in a sum certain"; *i.e.*, it must be a quantified to be a *proper* claim. Defendant contends that it does; however, the plaintiff contends that it does not. The defendant is obviously correct on this point as well, given the recent holding in several Federal Circuit and Claims Court cases. *See Contract Cleaning*, 811 F.2d 586, and *Metric Construction Co. v. United States*, 1 Cl.Ct. 383, 390 (1983). In interpreting § 605(c)(1) of the CDA, the court in *Contract Cleaning* stated that—"[w]e know of no requirement in the Disputes Act that a 'claim' must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer adequate notice of the basis *and the amount of the claim.*"[91] *Contract Cleaning*, 811 F.2d at 592. Further, the court in *Metric*, not only held that—"the contractor is required to certify that the 'amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable,'" but it also emphasized the fact that "the total dollar recovery ... is the bottom line of the dispute between the parties." *Metric*, 1 Cl.Ct. at 391.[92] We conclude that, with respect to contract claims asserted administratively, "the amount claimed must be stated in a manner which allows for reasonable determination of the recovery available at the time the claim is presented and/or decided by the contracting officer." *Id.*

We now turn to the critical questions—(i) whether the putatively-filed claims are proper, and (ii) if so, when does the interest commence to run as to each. Stated differently, is interest accruable on all subsequently-filed claims with the CO from the date the original claim is filed, *i.e.*, retroac-

---

**90.** *See Servidone*, 931 F.2d at 862.

**91.** CDA § 605(c)(1) provides in pertinent part: For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

**92.** Furthermore, the court in *Robin Industries, Inc. v. United States*, 22 Cl.Ct. 448 (1991), notes that, although the CDA contains no definition of the term "claim," the FAR defines "claim" as follows:

"Claim" ... means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain....

48 C.F.R. § 33.201 (1988).

tively, or does each claim utilize its filing date for the calculation of interest.

Our analysis of this record compels us to hold that only two of the above-filed claims are proper CDA claims, and they are the March 25, 1985 and the June 2, 1988 claims. The record is clear that these two claims are valid inasmuch as both are quantified and duly signed and certified by an authorized corporate official. We shall discuss the accrual date of the interest of these two claims after we briefly explain why the five claims are not valid CDA claims.

■ The May 26, 1983 claim was not quantified, nor was the document signed by any company official (PX 66). The August 8, 1983 claim contains an amount of $49,-000 therein; however, the complaint avers the quantum to be $169,556. We take that assertion to be a judicial admission against interest and irrefutable. Therefore, since it exceeded $50,000 and plaintiff failed to certify same, the claim is improper. The January 4, 1984 claim document reflected "zero" amount, whereas the complaint avers said claimed amount was $50,322. Under either scenario, plaintiff's claim is improper if we accept as a fact that it was not quantified, and secondly if we accept its judicial admission that its claim was $50,-332, then it is not proper because of the failure to certify. The May 29, 1984 claim of $37,507 is not a proper claim although duly quantified because it was not signed by anyone, i.e., we find from such fact that it is more probable than not that it is not a duly authorized corporate act, i.e., a nullity. Finally, we also find that the November 11, 1986 claim is not proper, although duly quantified in excess of $50,000, because it is not certified, nor does it purport to contain a signature reflecting an authorized corporate act.

■ Since we have found that the first proper claim was not filed by plaintiff until March 25, 1985, the interest thereon will commence at that time. That claim related primarily to the alleged additional costs ($163,183) stemming from the excess water differing site condition which included dealing with unsuitable soil.

The properly filed June 2, 1988 claim is a conglomeration of three previously improperly filed direct claims, i.e., August 8, 1983, totalling $169,556; January 4, 1984, totalling $50,322; and May 29, 1984, totalling $37,507, and the previously properly filed March 25, 1985 claim in the amount of $163,183. Additionally, the June 2, 1988 claim contained an impact claim of indirect costs in the aggregate amount of $454,637. The claim for $163,183 is not new, but is merely a restatement of the March 25, 1985 claim. A thorough analysis also discloses that the August 8, 1983 and the May 29, 1984 components of the June 2, 1988 claim are also not new claims. They relate to additional costs stemming from the excess water relating to removing soil from various locations, etc. In short, they merely represent additional costs premised on the same underlying factual basis and theory as the March 25, 1985 claim. As a revision of the initial proper claim, we believe that, on balance, the record reasonably supports a finding that the interest on the total allowable equitable adjustment, at bar, should, therefore, run from March 25, 1985.

In short, while we have multiple claim dates regarding the properly filed claims, we find that the subsequent claims are not new, but merely are a recomputation, revision, and expansion of the former, based on the same underlying facts. *Servidone,* 931 F.2d at 862, provides that interest is awarded on any amounts "found due ... from the date the contracting officer receives the claim." Where there are multiple proper claims filed, as here, and the later claim(s) are merely a revised or repeat claim, i.e., there has been no change in the underlying factual basis or theory of recovery or computation, then interest shall run from the date the initial claim is received by the CO. *Cf. Southwest Marine,* ASBCA No. 33208, 88–3 BCA ¶ 20,982 at p. 106,003, 1988 WL 81090.

We, therefore, conclude that the interest on the entire amount should commence from March 25, 1985.

## D. LIQUIDATED DAMAGES

Liquidated damages clauses are often used to encourage the timely performance

of a contract. *Goldberger Foods*, 23 Cl.Ct. 295, 312 (1991). They must be reasonable under the circumstances, however, and must not operate as a penalty.[93] *Rex Trailer Co. v. United States*, 350 U.S. 148, 151, 76 S.Ct. 219, 221, 100 L.Ed. 149 (1956). More importantly, when such damages are determined to be fair and reasonable, the United States Supreme Court has held that they should be enforced. *Wise v. United States*, 249 U.S. 361, 365, 39 S.Ct. 303, 304, 63 L.Ed. 647 (1919); *Priebe & Sons v. United States*, 332 U.S. 407, 411–12, 68 S.Ct. 123, 126, 92 L.Ed. 32 (1947).

In general, we have held that provisions for liquidated damages are not against public policy, particularly in cases involving government contracts. *Cegers v. United States*, 7 Cl.Ct. 615, 618 (1985); *JMNI v. United States*, 4 Cl.Ct. 310, 315 (1984). However, numerous safeguards have been imposed to ensure that the damages claimed are in fact fair and reasonable. *Higgs v. United States*, 212 Ct.Cl. 146, 156, 546 F.2d 373 (1976); *Racine Screw Co. v. United States*, 156 Ct.Cl. 256 (1962); *Goldberger Foods*, 23 Cl.Ct. at 312–13. For example, the "reasonability" or "fairness" of the "liquidated damages must be considered on a case-by-case basis." *Goldberger*, 23 Cl.Ct. at 313. In addition, the government is allowed to assess liquidated damages against a contractor only where it has acted reasonably in attempting to mitigate costs to the contractor. *Id.* Moreover, "the right to claim liquidated damages may be waived if the government prevents or *delays* performance within the time stipulated by the contract." *Id.* *See Fortec Constructors v. United States*, 8 Cl.Ct. 490, 508 (1985). In any event, the party alleging that the liquidated damages assessed are excessive or unreasonable must bear the burden of proving that said damages are inappropriate. *Goldberger*, 23 Cl. Ct. at 313.

▬ According to the facts herein, the government assessed liquidated damages in the amount of $46,750 (187 days at $250 per day), because of Youngdale's delay in completing the project.[94] The plaintiff, however, avers that it is entitled to the full $46,750 plus interest in light of the government's concession as to the water differing site condition.[95] Thus, given the foregoing relevant case law, and after a careful and thorough review of the evidence presented in this case, we believe that the plaintiff is correct, in that the government's assessment of liquidated damages was improper. This is especially true, for three reasons— (1) the government's concession to liability as to the water differing site condition, (2) the fact that the government failed to recognize that condition until more than seven years from whence it was initially notified, and (3) because the evidence adduced herein clearly depicts delays attributable to the defendant as a result of said condition. In any event, according to the Claims Court ruling in *Fortec:*

> [W]hen the contractor has agreed to do a piece of work within a given time and the

---

**93.** According to the Court of Claims, reasonable means "that which is proper, fair, equitable and honest in the judgment of a 'reasonable man,' and is suitable and appropriate to the end in view of the facts and circumstances." *National Steel & Shipbuilding v. United States,* 190 Ct.Cl. 247, 267–68, 419 F.2d 863 (1969).

**94.** The predecessor Claims Court noted in *Sun Eagle Corp. v. United States,* 23 Cl.Ct. 465, 480 (1991), that "a claim for liquidated damages is the quintessential government claim." Moreover, the *Sun Eagle* court held that, in accordance with the U.S. Court of Appeals for the Federal Circuit's decision in *Placeway Const. Corp. v. United States,* 920 F.2d 903 (Fed.Cir. 1990)—

> The Claims Court has jurisdiction over a final decision on a government claim even though

the claim is not certified: "The [contracting officer's] decision was adverse to Placeway and thus it could properly appeal to the Claims Court. As a final decision on a government claim, the Claims Court has jurisdiction even though the claim was not certified...." (citations omitted). *Sun Eagle,* 23 Cl.Ct. at 480.

**95.** Previously, on February 5, 1991, the plaintiff filed a partial motion for summary judgment alleging that the government wrongfully assessed liquidated damages in the amount of $46,750 against Youngdale. Said motion was denied on February 8, 1991, in light of the court's determination that the plaintiff had previously waived its right to file said motion and that, in the interests of conserving judicial resources, said issue would be more appropriately handled at trial.

parties have stipulated a fixed sum as liquidated damages not wholly disproportionate to the loss for each day's delay, in order to enforce such payment the other party must not prevent the performance of the contract within the stipulated time, and that where such is the case, and thereafter the work is completed, though delayed by the fault of the contractor, *the rule of the original contract cannot be insisted upon, and liquidated damages measured thereby are waived.*

*Fortec,* 8 Cl.Ct. at 508 (quoting *United States v. United Engineering and Contracting Co.,* 234 U.S. 236, 242, 34 S.Ct. 843, 845, 58 L.Ed. 1294 (1914)) (emphasis as depicted in *Fortec*). Therefore, given the Supreme Court's holding in this matter, we are obliged to conclude that, although the contractor may have delayed the project, the fact that the government caused the delay with respect to the excess water condition negates the applicability of the liquidated damages clause contained in the contract, and thereby prevents the government from assessing any amount with respect to liquidated damages against Youngdale.[96]

In addition to the foregoing analysis, plaintiff contends that it is also entitled to interest on the $46,750 in liquidated damages assessed, from December 1985 under the Prompt Payment Act and from November 1986 under the CDA. Under the Prompt Payment Act, 31 U.S.C. §§ 3901–3907, § 3902(a) provides that:

the head of an agency acquiring ... [a] service from a business concern, who does not pay the concern ... shall pay an interest penalty to the concern on the amount of the payment due. The interest shall be computed at the rate the Secretary of the Treasury establishes for interest payments under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. § 611).

Section 3902(b) provides:

[e]xcept as provided in section 3906 of this title, the interest penalty shall be paid for the period beginning on the day after the required payment date and ending on the date on which payment is made.

Section 3903(1) defines the required payment date as:

(A) the date payment is due under the contract for the item of property or service provided; or

(B) 30 days after a proper invoice for the amount due is received if a specific payment date is not established by contract.

Lastly, § 3906(a)-(b) provides:

(a) A claim for interest penalty not paid under this chapter may be filed under section 6 of the Contract Disputes Act of 1978 (41 U.S.C. § 605).

(b)(1) An interest penalty under this chapter does not continue to accrue—

(A) after a claim for a penalty is filed under the Contract Disputes Act of 1978 (41 U.S.C. § 601 *et seq.*); or

(B) for more than one year.

Given the foregoing language of the Prompt Payment Act, Youngdale is entitled to interest on its liquidated damages claim from either the date the government was required to pay it under the contract or 30 days from the date it submitted a proper invoice for the amount due. According to the evidence herein, the contract does not specifically require the government to pay Youngdale on any specified date; thus, the court looked to see when Youngdale submitted a proper invoice for the amount due under the contract. In so doing, the court found that Youngdale failed to submit any proof by which the court could determine when it submitted its invoice for payment of the contract price.

---

**96.** With regard to plaintiff's various other contentions as to why the government is not entitled to liquidated damages, *i.e.* (1) the CO's decision was arbitrary and capricious in that it was not rendered until two years after the assessment of liquidated damages; (2) the CO's decision is ineffectual because the CO did not grant Youngdale the opportunity to reply to the government's claim; and (3) the government's wrongful assessment is in violation of the terms of the contract and the Prompt Payment Act, there is no need to address said contentions at this time, in light of the court's finding that Youngdale is entitled to the full $46,750 of assessed liquidated damages for the reasons previously stated.

Consequently, we have determined that based on the fact that Youngdale has failed to raise any objections with respect to the *date* on which the government actually paid the agreed upon contract price, less liquidated damages, *i.e.*, June 16, 1988, said date is a reasonable date under these circumstances upon which we may deem that payment was due under the contract pursuant to the language contained in § 3903 of the Prompt Payment Act.[97] Thus, pursuant to these findings and the relevant statutory law, interest under the Prompt Payment Act shall begin to run from June 17, 1988, to September 19, 1988, the date Youngdale filed its claim with this court under the CDA. 31 U.S.C. § 3906(b)(1)(A). The appropriate interest rate shall be as specified in § 611 of the CDA. 31 U.S.C. § 3902(a).

 With this in mind, we now turn to the CDA to determine what interest thereunder, if any, plaintiff is entitled to on the amount of liquidated damages. Under the CDA, § 611, as previously noted, provides as follows:

> Interest on amounts found due contractors on claims shall be paid to the contractor *from the date the contracting officer receives the claim* pursuant to section 6(a) [41 U.S.C. § 605(a)][98] from the contractor until payment thereof.

41 U.S.C. § 611 (1982) (emphasis added). In addition to the foregoing, the Federal Circuit has specifically held that interest shall accrue from the date the CO receives the *contractor's* claim, *Servidone*, 931 F.2d at 862; *Fidelity Constr.*, 700 F.2d at 1385,

and, in following this well-established rule, the Department of Transportation Contract Appeals Board (DOT CAB) has held that interest shall not begin to run until the CO receives a properly-certified claim from the *contractor*. *Security Associates International, Inc.*, DOTCAB, Nos. 1340, 1432, 84–2 BCA ¶ 17,444 at 86,843, 86,861–62, 1984 WL 13455. Furthermore, the Board also indicated that, despite the plaintiff's contentions therein that said claim was a *government claim*, the contractor must, nevertheless, submit a claim with the CO for the underlying amount, *i.e.*, the $46,750 herein, in order to be entitled to interest under the CDA. *Id.* Consistent with the foregoing, the Claims Court in *Ruhnau–Evans—Ruhnau Associates v. United States*, 3 Cl.Ct. 217, 218 (1983), held that a literal reading of § 605(a) indicates that a *contractor*, not the government, must submit the operative claim to the CO. *Id.*[99] *See also Sun Eagle*, 23 Cl.Ct. at 482. Accordingly, in the case at bar, contrary to that of *Security Associates* wherein the contractor also filed a certified claim with the CO incorporating the government's underlying claim into its own claim, Youngdale failed to file a claim with the CO with respect to the underlying liquidated damages. While Youngdale may argue that its letter of reconsideration which was sent to the CO on November 27, 1990, constituted the operative claim upon which interest may begin to accrue, we disagree in light of the fact that said so-called claim was not a "proper" claim inasmuch as it was signed

**97.** The government paid Youngdale on June 16, 1988, a total of $2,666,526, which is the contract price of $2,713,276 less $46,750 in liquidated damages.

**98.** Section 605(a) states that "all claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (1982).

**99.** In *Ruhnau–Evans*, the plaintiff argued that it was entitled to interest because the court should treat the underlying "claim" before the court as a government claim upon which the CO has rendered a final decision, or that the court should consider the contractor's letter of protest accompanying its payment as a claim sufficient

to trigger the contractor's entitlement to the payment of interest on said underlying claim. *Ruhnau–Evans*, 3 Cl.Ct. at 218. All this being true, however, the court indicated that said government claim was not a certified claim submitted by the contractor to the CO. Specifically, the court stated that:

> To accept plaintiff's first theory, the court would have to ignore the words "from the contractor" which modify the term "claim." Section 611 plainly refers to a claim by the contractor, *not one by the government*. To accept plaintiff's alternate theory would require the court to overlook the words "pursuant to section 605(a)" which … [limits] the type of claim the contractor must present. *Id.* (emphasis added).

by plaintiff's attorney and not an *authorized official* of Youngdale, as required by the CDA.[100] Therefore, we are constrained to conclude that however unjust the result may be in this particular case, no interest may accrue under the CDA on monies withheld from contractually-prescribed payments, *i.e.*, liquidated damages, where the contractor has failed to file a "proper" certified claim with the CO with respect to said underlying claim. *Cf. Security Associates*, 84–2 BCA at 86,862. In summary, interest on the government's liquidated damages claim shall be accruable under the Prompt Payment Act from June 17, 1988 to September 19, 1988, but no interest shall be accruable under the CDA.

## CONCLUSION

Given the foregoing, we are compelled to hold that with regard to the water differing site condition, with respect to which the government has conceded liability, Youngdale has proven causation and resulting injury, and, therefore, is entitled to $343,-774.00, plus interest pursuant to 41 U.S.C. § 611. Interest with respect to the foregoing claim shall run from March 25, 1985.

With regard to the alleged rock differing site condition, we hold that Youngdale is *not* entitled to damages under this claim due to failure of proof. Finally, we hold that Youngdale is entitled to receive the $46,750 in liquidated damages previously assessed against it by the CO, plus interest from June 17, 1988 to September 19, 1988, pursuant to the Prompt Payment Act, 31 U.S.C. §§ 3901–3907. Youngdale, however, is *not* entitled to any interest on the $46,750 under the CDA. The Clerk shall enter judgment accordingly. Costs to the plaintiff.

IT IS SO ORDERED.

---

**100.** It is hornbook law that a corporation is an artificial entity. "Corporations must [therefore] act through individuals, and the ordinary rule is that an individual who is properly appointed as an agent of a corporation has the authority to bind that corporation within the scope of his or her authority." *Little River Lumber Co. v. United States*, 21 Cl.Ct. 527, 533 (1990). *See* 18B Am.Jur.2d, Corporations § 1341. In the case at bar, the plaintiff failed to submit any evidence in the record, *i.e.*, a power of attorney, establishing that Mr. Larry E. Robinson, attorney of record herein, had the requisite authority to submit a CDA claim to the CO on behalf of Youngdale. Consequently, we have determined that plaintiff's Request For Reconsideration letter dated November 27, 1990, is not a "proper" claim upon which CDA interest may accrue.

## APPENDIX-A

**NOTE:**

ROCK WAS REPORTEDLY ENCOUNTERED DURING PLACEMENT OF SANITARY SEWER LINE BETWEEN MANHOLES 3 AND 5.

**GRAPHIC SCALE**

1" = 60' 60' 0 60' 120'

(APPROXIMATE SCALE)

VANDENBERG AIR FORCE BASE, CALIFORNIA

V.O.Q. SUBSURFACE CONDITIONS

PLATE 1

BLDG. C

2F-81-25

2F-81-24

2F-81-23

BLDG. COMPLEX B

BLDG. COMPLEX A

PARKING AREA

G V.O.Q. 130/2

MANHOLE 5

4F-90-1

4F-90-2

SANITARY

SEWER

LINE

MANHOLE 3

MANHOLE 4

**V.O.Q. PROJECT LAYOUT**

APPROXIMATE SCALE: 1" = 60'

APPENDIX–B

As noted *supra,* the court observed that PX 165, Mr. Donald Scarbrough's CPM expert report, is contaminated with numerous nebulous discrepancies. The following is a list of such errors which we encountered during our review of plaintiff's critical path method schedules. Said list, merely illustrative, is by no means inclusive of all of the discrepancies encountered by this court. Moreover, the court has also provided a brief list of the various discrepancies it encountered in the post-trial Plaintiff's Supplemental Memorandum filed on February 18, 1992. Said memorandum *purports* to provide the court with a number of summary schedules derived from PX 165 which seek to clarify, as well as explicitly quantify, the number of delay days allegedly attributable to government-caused delay. Such was not established by the requisite quantum of proof, however, because it is abundantly clear to the court that, given the significant discrepancies contained in plaintiff's CPM report, *infra,* the court cannot justifiably rely upon a summary schedule of an expert report in which the foundational information contained therein is inaccurate and unreliable, given the testimony and evidence adduced on the record as a whole. In any event, in the interests of completeness, we have provided a list of illustrative errors with respect to plaintiff's schedules where we have found certain underlying data to be unreliable.

A. *Problems in the As–Built Schedule*

(1) There is absolutely *no* specific cross-reference tying in the data in the As–Built schedule to any of the daily reports from which the schedule is allegedly predominately derived. In fact, the activities as described within said schedule are, for the most part, completely ambiguous given the comprehensive and generic manner in which they are labeled and listed therein. As a result, the court is unable to determine with any degree of certainty what particular "tasks" make up an activity as it is referenced therein.

(2) Mr. Scarbrough testified that he used calendar days, and not work days, in scheduling the As–Built report. Tr. 100–05. He also testified that, because of this fact, he had to "adjust" the time durations of the various activities delineated in the daily reports to compensate for the added weekend days in order to run his program under a system of continuous calendar days, with start and finish dates, reflecting a seven-day work week instead of five. Tr. 1101–02. Accordingly, many of the individual start and finish dates are not accurate. Tr. 1113–14.

Mr. Scarbrough also testified that actual performance times could vary as much as four days, Tr. 1113–14, and that the computer software which he utilized to schedule this project was incapable of producing precise dates; thus, error margins of several days could exist as to each activity. Tr. 1113. Consequently, in the majority of instances, the actual dates of an activity cannot be determined from the As–Built schedule which, in the court's mind, calls into question the validity of the report's indications. Likewise, Mr. Scarbrough's testimony that holidays were not accounted for accurately in his computer-generated schedule also demonstrates the lack of accuracy and reliability of his report. Tr. 1101.

(3) In cross-checking the As–Built[1] report with the As–Planned report,[2] the court

---

1. The Joint Stipulated Glossary Of Technical Terms defined these terms as follows:

 AS–BUILT CPM *A CPM network that includes the same activities as the as-planned CPM,* but is based on actual performance dates. These dates are researched from the updatings of the original or as-planned CPM plan, the progress reports, and any other documentation available.... The as-built schedule is a factual schedule of when things occurred (and why they occurred)....

AS–PLANNED CPM The initially approved CPM network. This describes the manner in which the contractor intended to meet the requirements of the contract at the start of the project.
(emphasis added).

2. At first, it appeared to the court that the re-numbering of the As–Built schedule was necessary to allow the computer to implement its scheduling calculations, by listing each of the activities as they *actually* occurred during the

observed that Mr. Scarbrough renamed or recharacterized almost all of the activities in the As–Built report. As a result, a significant number of individual activities in the As–Built report are not traceable to the As–Planned report. In addition to this labeling problem, the activity code numbers on the As–Built chart were also almost completely renumbered. Therefore, even the few activities whose labels are initially traceable from the As–Built to the As–Planned are subsequently lost within the new renumbering system. Thus, no meaningful or reliable conclusion can be reached by comparing anticipated production with actual performances.

(4) Finally, as previously referenced, *supra*, even the data imputed into the As–Built report after June of 1984 was *not* actual data. Mr. Scarbrough testified at trial that he used the date contained on the As–Planned report to complete the As–Built report, because after June of 1984, there were large gaps in the dates of the "daily" reports, and the information provided thereafter was, in essence, unreliable. Tr. 1034–35. As a result, after June of 1984, the As–Built report fails to provide any relevant information as to what *actually* occurred during construction of the project. On cross-examination, the following colloquy is probative:

Q. From June 1984 to the end of the project [December 1984], is it correct that anything that you have identified as As–Built is not, in fact, As–Built?

A. That's correct.

Tr. 1035.

B. *Problems in the As–Built No Delay Schedule*

(1) Mr. Scarbrough admits that the activity code numbers in the As–Built schedule

project, which, in this case, would have been in an order different from that of the As–Planned schedule due to the water differing site condition. However, testimony later adduced at trial, and Tab 4 of plaintiff's post-trial supplemental submission, indicate that the linear relationships between the various activities did not necessarily dictate how a particular activity was to be numbered; in fact, it appears from the record as a whole that various related activities were often remotely numbered for mere convenience sake. *See* Tab 4, Supplement to Post-

do not correlate to the numbers contained in the As–Built No Delay schedule. Tr. 1074, 1117. Further, Mr. Scarbrough testified, "[when] I tell the computer [to] take [a group of] activities and move them over to another project ... it renumbers them for me. I'm not really happy with it. It makes it so that the cross referencing is very difficult. I'm not really happy with that part of it." Tr. 1074. More importantly, neither Mr. Scarbrough nor the plaintiff provided the court with a mechanism by which it could cross-reference the activities from the As–Built to the As–Built No Delay in light of the foregoing proof problems. This is true, despite Mr. Scarbrough's testimony that—he too saw a distinct need for cross-referencing the items on the various schedules; it makes cross-referencing very difficult; and he deemed this to be an error. Tr. 1057, 1074.

(2) On the As–Built report, we observed that there were 12 *critical* items, *i.e.*, numbered 550, 554, 558, 560, 598, 600, 602, 604, 610, 650, 658, and 1423, which were omitted from the As–Built No Delay schedule. Tr. 1058. No satisfactory explanation was given for such an occurrence. In fact, Mr. Scarbrough admitted that " ... it is difficult to say what they would do." Mr. Scarbrough also testified that said omission was an error. Tr. 1061.[3]

(3) In comparing the As–Built and the As–Built No Delay schedules, we further observed that the time durations noted for a particular activity on the As–Built schedule, *i.e.*, the number of days in which it actually took to complete a particular activity, often do not agree with the time durations noted on the As–Built No Delay for the same activity. For example, at trial Mr. Scarbrough admitted that, with respect

Trial Brief, and Tr. 1117–35. This renumbering problem also occurs with respect to the activity codes listed on the As–Built No Delays report. *See* Section B, number (1) herein.

3. On cross-examination, when asked as to why these 12 items were removed, Mr. Scarbrough responded, "This is an error. When I made the transition [from the As–Built to the As–Built No Delay], they didn't move over." Tr. 1061.

to the As–Built schedule, activity code number 1422, entitled "B RI PLUMB/ MECH UNISTRUT" indicated that said activity took three days to complete; however, on the As–Built No Delay schedule, that very same activity took 45 days to complete. PX 165. Although Mr. Scarbrough admitted that the two activities were one and the same, he was unable to explain the reason for the extreme variation in the time durations between the two schedules. Tr. 1143–44.

### C. *Problems in Plaintiff's Post–Trial Supplemental Summary Schedules*

Plaintiff's Supplemental Memorandum dated February 18, 1992, filed post-trial, contains five major sections which purport to summarize the results of Mr. Scarbrough's expert report, as well as link said report to the testimony and exhibits adduced at trial. Tab 1 of the supplement is entitled "Schedule Of Critical Activities With Related Critical Delays For The Vandenberg Project Through 6/11/84 (Without Cross–Reference)." Tab 2 is entitled "Schedule Of Critical Activities With Related Critical Delays For The Vandenberg Project Through 6/11/84 (With Cross–References To 'Testimony' and 'Documentary Evidence')." Tab 3 is "Summary of the Delays To Activities With Redundancies Removed," and Tab 4 is a "Breakdown Of Information Set Out In Previous Schedules Analyzed By Cause (Redundancies Removed)." Lastly, Tab 5 is entitled "Delays Cross–Referenced To Trial Testimony And Exhibits For The Delay Caused By The Government After 6/18/84."

In the interests of brevity, we shall *only* discuss those errors which we found in Tabs 3 and 4 of the Supplement, since Tabs 3 and 4, according to the plaintiff, purport to support its primary contention that it is entitled to 206 government-caused delay days from March 15, 1983 to June 11, 1984.

(1) In Tab 3, the plaintiff argues that all the delays in Mr. Scarbrough's report add up to *374 actual days of critical delay* having removed any concurrent delays. The first error we note is that the list itself

adds up to only 370 critical delay days, and secondly, there is no reference therein as to *what* concurrences were removed from Tab 1 and *why*. No rationale was given as to what activities resulted in concurrent delays, nor was there any specific evidence identified or adduced at trial as to that fact by plaintiff. Thus, the court is troubled and handcuffed by its inability to verify whether any and all redundancies have in fact been removed, and, for that matter, whether said removal was accurately accomplished, particularly in light of the numerous discrepancies already noted in PX 165.

(2) In Tab 4, the plaintiff attempts to breakdown and categorize the list of alleged delay days contained in Tab 3, by various groups of individual activities. That is, for each alleged government-caused delay delineated in Tab 3, the plaintiff provides a schedule of related activities which allegedly make up the total number of delay days indicated in Tab 3. In so doing, however, the court observes that plaintiff neglected to include 10 of the listed critical delay entries contained in Tab 3, totaling 130 delay days, in its Tab 4 breakdown. Consequently, the court is unable to trace 130 of the alleged Tab 3 delay days with those alleged activities which compose said delay days in Tab 4.

(3) Also, in Tab 3, plaintiff cites 462 days as the period (March 15, 1983 to December 19, 1984) "covered by this report," *i.e.*, *construction days*. Mr. Scarbrough testified, however, that his report covered 615 days or 645 days depending on which actual start date was used by him in preparing his report, either March 15, 1983, or April 14, 1983. Tr. 1164 and 1167. *See, infra*, Miscellaneous Errors, number (2). Moreover, we note that Tabs 1 and 2 indicate that, prior to removing concurrences in delay calculations, plaintiff allegedly experienced 463 (added as 459 in error) days of delay. Thus, the 462 or 463 days noted above appear to relate to the number of unsanitized alleged *delay days* and not construction days. We suspect that, given the convoluted manner in which this expert report was prepared, the plaintiff must have confused the number of construction

days (*i.e.*, 645), *supra*, with the number of alleged delay days (463) indicated therein.

(4) Finally, in Tab 3, the court further observed that the plaintiff contends that of the 374 (this tab adds up to 370) calendar days of delay, 206 of these alleged delay days were the result of the actions of the government. That is, the plaintiff concludes that "but for" the actions of the government, "Youngdale would have completed the work in *168 calendar days*," *i.e.*, the entire project. (*See* "As–Built No Delay Section of Scarbrough Report–Exhibt 165). In reviewing the As–Built No Delay schedule, the court could find no reference therein, nor could it determine therefrom that, "but for" the government's actions, the plaintiff *would have completed the project within 168 calendar days*. To the contrary, the As–Built No Delay schedule in fact represents that the project would have taken 359 days to complete "but for" the government-caused delays. Moreover, the As–Planned schedule projected 450 days to complete the project, and the contract also indicated that the plaintiff was allowed by the defendant 450 days to complete construction. *See* DX 1, p. SP–1. Where and how the plaintiff determined that it could complete construction of this *entire project*, against this background, in 168 days is a total mystery to this court, and shall obviously remain so, in light of the fact that nowhere in either the testimony or exhibits is there any reference to the number 168. Consequently, we conclude that the foregoing further calls into question the total absence of probative value of Mr. Scarbrough's opinion report.[4]

D. *Miscellaneous Problems Re Plaintiff's Exhibit 165*

(1) In reviewing Mr. Scarbrough's testimony, it is clear that he even failed to explain the meanings of the captions to the columns on the three reports, *i.e.*, the As–Planned, the As–Built, or the As–Built No Delay. Although some column headings

were blandly mentioned at one point, they were never explicitly defined so as to facilitate the court's use of PX 165 in its deliberations. Tr. 1062. In fact, the record shows that even the defendant had to inquire on cross-examination as to the meaning of various columns contained in the As–Built report. Tr. 1062–63.

(2) In PX 165, the As–Built schedule indicates that the project took *657* days to complete, with a start date of *March 15, 1983*, and a finish date of *December 30, 1984*. According to Mr. Scarbrough's testimony at trial, however, the actual start date was *April 14, 1983*, and the actual completion date was *December 19, 1984*. Tr. 1160–63. He then testified that, in using those dates to calculate the amount of time it took to complete the project, said period would be *615* calendar days. Tr. 1164. Mr. Scarbrough later corrected himself to indicate that the *April 14, 1983* date was the scheduled start date, and that the actual start date was *March 15, 1983*. *Id*. He, therefore, recalculated the construction period to be *645* days, from *March 15, 1983* to *December 19, 1983*. Tr. 1165–67. Notwithstanding the foregoing inconsistencies, Mr. Scarbrough again corrected himself in his testimony as to the correct actual start date. This time, Mr. Scarbrough testified that the *April 14, 1983* date was in fact the correct actual start date, not *March 15, 1983*, and, therefore, the additional 30–day period which he had previously added to his 615–day calculation was erroneous. Tr. 1212–13.

In any event, the As–Built report in PX 165 clearly indicates that the project took 657 calendar days to complete, not 615 days, as well as depicts the start and finish dates for the project as March 15, 1983 and December 30, 1984, not April 14, 1983 and December 19, 1984. In reviewing the parties' "Stipulated Joint Memorandum of Contentions of Fact," filed on July 25, 1990, the court notes, however, that the parties stipulated that construction began on April 14, 1983, and ended on December

---

**4.** It appears to the court that the plaintiff merely subtracted the 206 alleged government-caused delay days from the 374 days of critical delay contained in Tab 3, to arrive at "but for" 168 days. This we believe to be mere speculation, however.

19, 1984. Clearly, the parties' stipulations and the plaintiff's expert report are inconsistent as to this extremely important factor.

(3) According to the As–Built schedule, Youngdale completed the project 206 days beyond the contract completion date, *i.e.*, from June 7, 1984 to December 30, 1984. Mr. Scarbrough testified, however, that the actual construction period beyond the contract completion date was 195 days, *i.e.*, from June 7, 1984 to December 19, 1984. Tr. 1167. Obviously, the extra 11 days (206–195) are a result of the report's erroneous use of December 30, 1984 as its completion date, when in actuality said stipulated date was December 19, 1984.